UNITED STATES of America,
Plaintiff–Appellee,

v.

Ethel Mae MERRYMAN and Kenneth
Darrell Brown,
Defendants–Appellants.

Nos. 79–1405, 79–1406.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted July 8, 1980.

Decided Sept. 18, 1980.

Thomas S. Udall, Asst. U.S. Atty., Albuquerque, N.M. (R. E. Thompson, U.S. Atty., and Stanley K. Kotovsky, Jr., Asst. U.S. Atty., Albuquerque, N.M., with him on brief), for plaintiff–appellee.

William C. Marchiondo of Marchiondo & Berry, P. A., Albuquerque, N.M., for defendants–appellants.

Before BARRETT, DOYLE and LOGAN, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

Defendants were convicted of possession with intent to distribute marijuana and for aiding and abetting in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The cause was tried to a jury. Verdicts of guilty were returned and the matter is before us on appeal. The sentences were a term of imprisonment of five years with a special parole term of two years to follow.

Defendants were arrested on February 1, 1979, after they had stopped their pickup truck at a filling station near Truth or Consequences, New Mexico.

Just prior to approaching a checkpoint operated by the U.S. Border Patrol, the truck had pulled over to the side of the road. The stop was observed by Phillip Woolford of the U.S. Border Patrol who was at the checkpoint station. Through binoculars, Woolford saw Brown get out of the truck, walk around it as if examining it, and then get back inside. After waiting for a string of traffic to pass the truck, a U–turn was made across the median and the truck went back in a southerly direction. Woolford said that he suspected that the truck was carrying illegal aliens. Because of this, Woolford followed the truck in a marked patrol car without activating his emergency equipment. He testified that the truck was of a type frequently used to transport illegal aliens, and that while following the truck he observed lumpy objects in the back covered with a tarp.

The truck left the highway at Truth or Consequences and turned into a gas station. Woolford followed. As he approached the truck, Brown got out and yelled to the station attendant for a can of oil. Woolford questioned Brown about his citizenship and received the reply, "American." Brown stated that he had borrowed the truck and did not know what was in the back. Woolford gave the following testimony concerning what took place:

And I stuck my head over the sideboard in preparation for reaching down and patting the aliens and telling them to come out from under there.

When I stuck my head over, I got a whiff of what I thought was marijuana, but at the same time, I could see debris of

hay or something right up against the front of the headlight up underneath the tarp there, and my first instinct was, well, maybe it's hay, but I took two strong breaths intentionally, and identified it. I was sure it was marijuana.

The truck contained 242 pounds of marijuana.

Woolford then called for assistance and placed Mr. Brown and Ms. Merryman under arrest. Border Patrol Agent Phillip Sanchez arrived at the scene. Sanchez searched the cab of the truck prior to driving it back to the checkpoint. Approximately $6,000 in cash was found. A gasoline receipt for an airplane and a transmitter verifier of the kind often used by smugglers were also found. Defendants moved to suppress the marijuana plus the items found in the cab of the truck on the ground that the search and seizure was illegal. The motion was denied.

At trial, defendants presented a joint defense that they had borrowed the truck and that they were unaware of its contents.

Defendant's contentions in support of requested relief on appeal are:

1. That the marijuana and other items seized from the truck must be suppressed because these are the fruits of an unlawful search which violated the Fourth Amendment of the Constitution.

2. Reversible error is claimed in connection with the admission of evidence of two other drug related incidents, one involving Mr. Brown and the other involving Ms. Merryman. It is claimed that the incidents are unrelated to the charges in the present case and to the defendants and do not have significant probative value.

3. Reversible error as a result of admitting into evidence a photo array which was unnecessarily suggestive and lacked the necessary I.D. and other indicia of reliability.

4. The propounding of certain questions addressed to the defendants on cross-examination concerning what they told law enforcement authorities prior to trial is assigned as error; similarly, a comment made in closing argument concerning failure to call a certain witness was, it is said, a violation of their Fifth Amendment constitutional rights.

I.

## WAS THE SEARCH AND SEIZURE VALID?

We conclude that it was.

■ Agent Woolford did not have probable cause to search the defendants' truck based on the fact that it made a U–turn just prior to reaching the checkpoint and that he observed "lumpy objects" in the bed of the truck. However, additional considerations come into play when an officer is policing the border to prevent the entry of illegal aliens. The governmental interest in preventing such entry and the lack of practical alternatives led the Supreme Court in *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) to hold that an officer on roving patrol may stop a vehicle if he is aware of specific articulable facts together with rational inferences from the facts which reasonably warrant suspicion that the vehicle contains aliens who may be illegally in the country. Probable cause is unnecessary under such circumstances to stop the car briefly in order to investigate the circumstances which have given rise to the suspicion.

The government was not required to *stop* the truck at the threshold of the investigation. Hence, it was not necessary to invoke the investigatory stop rule of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), at the check point.

What were the suspicious circumstances? Brown avoided the check point. He was driving a pickup truck which had lumpy objects in the bed of the truck. These were in plain view. The officer drove into a gas station, disembarked from the truck and questioned defendant Brown. The officer asked Brown his citizenship. Brown stated that he was an American and that he had borrowed the truck and did not know what was in the back. In checking out the

mounds or lumps which were in the back of the truck, Woolford bent over and looked at the suspicious looking truck and its contents and as he did so he said he "got a whiff" of what he thought was marijuana. He could see hay or something up against the headlights underneath the tarp. He took two strong breaths in order to try to identify it and concluded that it was marijuana. It was. There were 242 pounds of it.

There can be no question but that this was what is called an investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968), and constitutes a Fourth Amendment restraint. The only question, then, it whether the stop satisfied the requirements set forth in *Brignoni–Ponce, supra*, and, if it did, whether the agent exceeded the scope of the investigatory search authorized by the circumstances. It is well settled that the stop must be justified by specific articulable circumstances which give rise to a reasonable suspicion that aliens were being transported in the truck.

The evidence showed that the agent conducting the search knew as he approached the defendant Brown at the gas station that the truck had made a U–turn at the last possible point at which it could avoid the checkpoint. Furthermore, from Woolford's experience, he knew that vehicles which made such U–turns, such as the truck in this case, often did so to evade the check-

point and often carried illegal aliens. Also, the vehicle was a pickup truck with sideboards of the type used for transporting illegal aliens. A visible condition was the presence of a tarp in the back of the truck which covered the lumpy objects which have been described and which were regarded by the agent as being bodies.

*Brignoni–Ponce* gives a rather full discussion of the factors to be considered in determining when an articulable suspicion is shown which justifies stopping a vehicle in border areas.[1]

*Brignoni–Ponce* approved the investigatory approach of the vehicle under the circumstances there present.

■ In our view, the facts in this case were sufficient to justify an objective suspicion on the basis of which an investigatory check of the vehicle could be carried out. The defendants, however, rely on *United States v. Ogilvie*, 527 F.2d 330 (9th Cir. 1975), wherein it was held that the mere fact that defendant avoided a checkpoint by exiting the highway just prior to reaching it did not provide the officers with the requisite suspicion so as to justify a stop under the *Brignoni–Ponce* formula. The court in *Ogilvie* noted that there was no evidence that defendant was driving in a fast, unusual or erratic manner, or that

1. The Court in *Brignoni–Ponce* said:
Officers may consider the characteristics of the area in which they encounter a vehicle. Its proximity to the border, the usual patterns of traffic on the particular road, and previous experience with alien traffic are all relevant. See *Carroll v. United States*, 267 U.S. 132, 159–161, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *United States v. Jaime–Barrios*, 494 F.2d 455 (CA 9), cert. denied 417 U.S. 972 [94 S.Ct. 3178, 41 L.Ed.2d 1143] (1974). They also may consider information about recent illegal border crossings in the area. The driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion. See *United States v. Larios–Montes*, 500 F.2d 941 (CA 9 1974); *Duprez v. United States*, 435 F.2d 1276 (CA 9 1970). Aspects of the vehicle itself may justify suspicion. For instance, officers say that certain station wagons, with large compartments for fold–down seats or spare tires, are frequently used for transport-

ing concealed aliens. See *United States v. Burgarin–Casas*, 484 F.2d 853 (CA 9 1973), cert. denied 414 U.S. 1136 [94 S.Ct. 881, 38 L.Ed.2d 762] (1974); *United States v. Wright*, 476 F.2d 1027 (CA 5 1973). The vehicle may appear to be heavily loaded, it may have an extraordinary number of passengers, or the officers may observe persons trying to hide. See *United States v. Larios–Montes, supra*. The Government also points out that trained officers can recognize the characteristic appearance of persons who live in Mexico, relying on such factors as the mode of dress and haircut. Reply Brief for United States 12–13, in *United States v. Ortiz*, 422 U.S. 891 [95 S.Ct. 2585, 45 L.Ed.2d 623]. In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling. *Terry v. Ohio*, 392 U.S., at 27 [88 S.Ct., at 1833]. (Footnote omitted.)
422 U.S. at 885, 95 S.Ct. at 252.

there had been disobedience of any traffic laws. The present case does not conflict with *Ogilvie*.

Here it is not merely avoidance of the checkpoint. It is the total circumstances which must be looked to in deciding whether an articulable suspicion is present. The facts which gave rise to the agent's suspicion here that a transportation of illegal aliens was taking place were more abundant as well as more cogent than were the facts in *Ogilvie, supra*. We hold that the agent was justified in his suspicions, whereby he did not violate the defendants' rights.

The defendants make the further point that the agent exceeded his legal authority by bending over the sideboards of the truck in order to pat the lumps which he thought were aliens. It was only then that he smelled the marijuana. This Circuit has held that the smelling of marijuana by an experienced observer furnishes probable cause for the search. *United States v. Sperow*, 551 F.2d 808 (10th Cir. 1977); *United States v. Bowman*, 487 F.2d 1229 (10th Cir. 1973). We decline to hold that he was precluded from bending over. This defies logic and common sense. Having smelled the marijuana, the officer was fully justified in pulling back the tarp and taking a look at it and then seizing it. Moreover, it was not inappropriate for him to arrest the two occupants of the vehicle.

In *Brignoni–Ponce*, there was a detention which was held to have been based on less than probable cause. It involved a brief stop and a minimal intrusion. The Court said that an officer may ask the occupants of the vehicle about their citizenship and immigration status, and that he may ask them to comment on suspicious circumstances. However, further detention or search is to be based on consent or probable cause. 422 U.S. at 881–882, 95 S.Ct. at 2580–2581.

The above does not, of course, mean that there is no limitation on the intrusion. It is generally held that it must be reasonably related in scope to the justification for commencing it. *Warden v. Hayden*, 387 U.S. 294, 310, 87 S.Ct. 1642, 1652, 18 L.Ed.2d 782

(1967). Also, if there was no probable cause, the intrusion must be brief and narrowly circumscribed.

Agent Woolford did not notice the smell when he was speaking with the defendant alongside the truck. He did not become aware of the smell until he stuck his head over the sideboard and prepared to reach down and pat the aliens and tell them to get out. He was justified in initially approaching the truck. He was certainly authorized to question Brown about his citizenship and inquire about what was under the tarp. Any information or anything observed from such a position is not to be ruled to be in violation of the Fourth Amendment. *Brignoni–Ponce* expressly approved questioning concerning citizenship of the driver and passengers and requests to explain suspicious circumstances. Also, the Court made general statements that, given the fact that there had been articulable suspicion, the officer could stop the car briefly and investigate the circumstances that provoked the suspicion. 422 U.S. at 881, 95 S.Ct. at 2580.

The tarp in the back of the truck which covered uneven objects reasonably suggested to the officer that there might be illegal aliens under the tarp. This was unquestionably one suspicious circumstance which was articulated. When Brown was asked about his citizenship and the ownership of the truck, he said that he had borrowed the truck and did not know what was under the tarp. This did not dispel the suspicion that the tarp covered illegal aliens. The question arises as to how far an officer may go in investigating suspicious circumstances where probable cause does not exist. It is clear that he cannot conduct a full–scale investigation.

The view of the marijuana covered with the tarp was a suspicious circumstance and that, together with the avoidance of the checkstop, certainly justified the leaning over the bed of the truck and patting the lumpy objects. This is particularly true given the fact that these objects were in plain view. To say the least, the leaning over the bed of the truck and touching the

objects was a minimal intrusion which could scarcely be called a search requiring probable cause.

The defendants maintain that the search of the cab of the truck after the agent followed the truck to the gas station as a result of the truck avoidance of the check-stop was illegal. Once the agent smelled the marijuana, he was certainly justified in the search of the entire truck. *See United States v. Sperow, supra.*

The government also urges that it was appropriate to seize the truck pursuant to 49 U.S.C. § 782, which provides for seizure of vehicles used in the transportation of contraband. This being the case, the officers had the authority to search the entire vehicle. *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); *United States v. Stout,* 434 F.2d 1264 (10th Cir. 1970); *Siramarco v. United States,* 315 F.2d 699 (10th Cir.), *cert. denied* 374 U.S. 807, 83 S.Ct. 1696, 10 L.Ed.2d 1032 (1963). The Supreme Court in *Cooper* held that an officer who has probable cause to seize a vehicle may conduct a search of the vehicle without a warrant irrespective of whether the search or seizure took place first.

The agent made a quick search of everything in the vehicle immediately after the encounter with Brown at the gas station. He found the money in a sack of clothing in the pickup. He said that he felt a hard object in the sack wrapped up in some clothes. This turned out to be a package of foil with a rubber band around it. He unwrapped the foil, found the money and rewrapped the package. The transmitter was found in the unlocked glove compartment. He also found a gasoline receipt for airplane gasoline which was apparently in plain sight on the floor of the truck.

We are unable to see that the search was in any way excessive and hence illegal.

## II.

### THE ALLEGED ERROR RESULTING FROM RECEIPT OF EVIDENCE OF OTHER ACTS

■ There are two acts about which complaint is made. The first was that four days after the arrest of the defendants, a search of the luggage compartment of a plane that Mr. Brown had piloted uncovered garbage bags and duct tape identical to that used to package the marijuana found in the truck, and also a scale and chamois that smelled of gasoline. All of this evidence was offered for showing that the possession of the marijuana found in the truck was knowing and intentional. There was a second incident which occurred six months prior to the arrest. The government introduced evidence that a truck registered in Ms. Merryman's name had been seized while being loaded with marijuana, and that her purse and driver's license were found at the scene. Ms. Merryman was not charged in this transaction. It is the government's position that this evidence was admissible to rebut the claim of mistake or lack of knowledge or intent. Both of the defendants claimed at the trial that the pickup truck involved in the present incident was borrowed and that they had no knowledge that it was carrying contraband.

Defendants, on the other hand, argue that the evidence of prior acts was prejudicial because they say that the acts were not sufficiently connected with them or the charges in order to carry significant probative value and that any probative value was outweighed by the prejudicial effect of the evidence. Fed.R.Evid., Rule 403, 404(b). However, the trial court ruled and instructed the jury that the evidence was admissible for the purpose of proving that the defendants acted willfully and with specific intent and not because of mistake or accident or other innocent reason.

Rule 404(b) of the Rules of Evidence deals with other crimes, wrongs or acts, and it declares that:

. . . Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The evidence concerning Ms. Merryman in this case answered a specific requirement. It shed some light on the state of mind of the defendant Merryman, who claimed that she was ignorant as to how the truck was being used. This is a defense that cannot be used repeatedly. The defense was more or less her position in the so—called similar transaction which is in issue at the present time, and so there can be no question about the relevance of this evidence. It was highly germane.

We also take note of the fact that the trial court gave a limiting instruction on the subject. It is worthwhile to quote the instruction in full since it is not merely a general statement but is a specific admonition. The court said:

If you should find beyond a reasonable doubt from other evidence in the case that the Defendant did the act charged in the Indictment, then you may consider evidence as to an alleged earlier act of a like nature in determining the state of mind or intent with which the Defendant did the act charged in the Indictment.

And where proof of an alleged earlier act of a like nature is established by evidence, which is clear and conclusive, you may, but are not obliged to, draw inference and find that, in doing the act charged in the Indictment, the Defendant acted willfully and with specific intent and not because of mistake or accident or other innocent reason.

The question of knowledge on the part of Ms. Merryman was a vital issue in the case. She maintained that she was unaware of the use that was being made of the truck. The similar transaction also revealed that a truck which she owned was being used to transport large quantities of marijuana. She steadfastly maintained that this was without her knowledge. The prior transaction effectively checks an effort on her part to explain the present transaction in terms of unawareness of the use of the truck to transport marijuana.

It is also argued that the evidence is remote in time; that it occurred some six months prior to the transaction charged in the indictment. Considering the similarity of the prior transaction and the tie—up, which is the use of a truck owned by Ms. Merryman, and considering also that the evidence was introduced and the jury was instructed to consider it for the purpose of determining the state of mind or intent, it is our conclusion that the relevancy was not undermined by the six—month period of time. The similarity of the transactions and of the explanation fully justifies the acceptance in evidence of the other transaction.

### III.

### THE QUESTION WHETHER THE COURT ERRED IN RECEIVING EVIDENCE AS TO IDENTIFICATION OF MS. MERRYMAN BY MEANS OF AN ARRAY OF PHOTOGRAPHS

■ It is contended by the defendant Merryman that the photo identification of her was unnecessarily suggestive and unreliable and for that reason should not have been received.

A Mr. Blalock testified that he sold the truck, which is important evidence in the case, to a woman who identified herself as Helen Landry. He testified at the trial that when he was interviewed a short time prior to the trial by drug agents, he selected the photograph of Ms. Merryman from an array presented to him. He said that it looked like the same woman to whom he had sold the truck. Objection was made to the photo array on the ground that none of the other photos came close to looking like Ms. Merryman; that all of the photographs except that of Ms. Merryman had numbers on them; that Ms. Merryman's and one other were the only ones which were in color; and that only one photograph was of an Anglo.

Mr. Blalock's testimony was less than positive at the trial. He said that too much time had passed to permit an absolute identification. However, his testimony was corroborated by a handwriting expert who identified Ms. Merryman's handwriting on the title. The trial court found that the

array was not suggestive. It is also to be noticed that Blalock was not coerced or in any way prompted. Also, he did not identify Ms. Merryman as a passenger in the pickup truck. His identification served only as a link in the ownership of the truck.

In our judgment the trial court did not abuse its discretion in finding and determining that the array was not too suggestive.[2]

## IV.

## THE QUESTION WHETHER THE UNITED STATES ATTORNEY'S COMMENTS HAVING TO DO WITH STATEMENTS BY DEFENDANTS AND FAILURE TO CALL A WITNESS WERE PREJUDICIAL

 Both of the defendants testified that the truck which was being used for the transportation of the dope was owned by a Mr. Ellis of Truth or Consequences. Mr. Ellis never appeared and consequently he was just a name. Defendants said that Ellis owed Brown a bill in connection with the rental of an airplane. It was claimed that Ellis wished to rent the plane on January 31, 1979, and in order to induce Brown to deliver the aircraft from Albuquerque to Truth or Consequences, an offer was made to pay Brown the past due rentals plus future rentals for a total of $6,000. Ellis also offered to loan his truck to Brown to be driven back to Albuquerque. The other part of the testimony was that Ms. Merryman accompanied Brown just for the ride. Neither of them knew, so they said, about the contents of the truck.

Brown was cross–examined by the United States Attorney who learned that Ellis was not at trial to testify and so the United States Attorney pursued the matter and asked Brown if he had ever told any law enforcement officer about Ellis. Before Brown could answer, objection was made and sustained and the jury was admonished to disregard the question. On cross–exami-

nation of Ms. Merryman, the United States Attorney asked part of a question as follows: "Did you ever tell the Drug Enforcement Administration . . .?" Here again, objection was interposed before the question could be completed and the answer could be given. In the United States Attorney's closing argument he referred to "this mysterious Ellis who doesn't testify." The defendants maintain that the total result of these three incidents of misconduct was violative of their constitutional rights guaranteed by the Fifth Amendment. Particularly, they say that the first two incidents in question sought to compel evidence. The third deprived them of a fair trial in that it called attention to the two questions which were ruled out.

It is, of course, an error of constitutional dimension to comment on the defendant's right to remain silent at the time of arrest and to refrain from making any kind of statement to officers when taken into custody. *United States v. Gilliland,* 586 F.2d 1384 (10th Cir. 1978); *United States v. Arnold,* 425 F.2d 204 (10th Cir. 1970); *United States v. Nolan,* 416 F.2d 588 (10th Cir. 1969).

The Supreme Court in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), held that any effort to impeach a defendant by his silence at the time of arrest following the giving of *Miranda* warnings violates due process under the Fourteenth Amendment because implicit in the *Miranda* warning that a person has a right to remain silent is the assurance that the silence will carry no penalty. The Court did not, however, reach the question of whether use of a defendant's silence for impeachment purposes during other post arrest or pretrial periods violated the constitutional guarantees. *Doyle, supra,* 426 U.S. at 616, n.6, 96 S.Ct. at 2244, n.6.

Fortunately for the United States Attorney, the defendants' lawyer objected imme-

---

**2.** *See United States v. Munn,* 507 F.2d 563 (10th Cir. 1974), *cert. denied* 421 U.S. 968, 95 S.Ct. 1959, 44 L.Ed.2d 456 (1975); *United States v. Coppola,* 486 F.2d 882 (10th Cir.

1973), *cert. denied* 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974); and *United States v. Woodring,* 446 F.2d 733 (10th Cir. 1971).

diately. The result is that nothing prejudicial was elicited. If we assume that the questions referred to post *Miranda* warning silence or if we assume that *Doyle* condemns any reference to any pretrial silence, we must determine whether the questions of the United States Attorney were prejudicial.

The question to Brown was never answered. It was stricken from the record and the jury was instructed to disregard it. The second statement was interrupted with an objection. The United States Attorney said that he sought to ask Ms. Merryman whether she told the DEA "if she was employed as a housewife and that's all." The jury, of course, was not informed as to the answers.

A somewhat similar case is that of the Fifth Circuit in *United States v. Serrano*, 607 F.2d 1145 (5th Cir. 1979), *cert. denied* 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980). A Customs official there asked whether the defendant made any statements following his being taken into custody. The defendant's objection was sustained and there was never an answer given. The court stated: "The question could have been answered 'yes' and 'no,' and standing alone, it is not so suggestive as to constitute comment on defendant's silence." *Id.* at 1151.

As in *Serrano*, the questions were aborted, whereby it cannot be said that prejudicial comments were made on the exercise by the defendants of their constitutional right to remain silent. There was testimony that Brown told Woolford that the truck was borrowed at the time that he, Brown, was approached. This statement is not inconsistent with the defense presented, and there is no basis for the jury to draw prejudicial inferences from the unanswered questions. No testimony elicited by the United States Attorney brought to the surface whether the defendants exercised their right to remain silent, whereby the jury could have inferred such a conclusion. The only thing that the jury was told to disregard was the completed question.

In sum, no reversible error is apparent.

\* \* \* \* \* \*

We now turn to the complaint that an error occurred as a result of the United States Attorney's comment concerning the failure of the mysterious Mr. Ellis to appear and to testify. The defendants contend that this deprived them of their due process rights to require the government to assume the burden of proof beyond a reasonable doubt; that it had the cumulative effect of calling attention to the aborted questions as to whether any exculpatory statements were made to the DEA officers. We have held in this circuit that in some instances comments concerning the failure to call a witness are proper. Where, for example, the failure to call a witness who has been shown to have knowledge of facts in the case raises an inference that if the witness were called, the testimony would be harmful or injurious to the accused. *United States v. Dyba*, 554 F.2d 417 (10th Cir.), *cert. denied* 434 U.S. 830, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).

In *United States v. Mitchell*, 613 F.2d 779 (10th Cir.), *cert. denied* 445 U.S. 919, 100 S.Ct. 1283, 63 L.Ed.2d 604 (1980), we concluded that the prosecutor's comment in closing argument concerning the failure of the defendant's wife to testify was not error where no objection was made at the time of trial. Defense counsel had argued that the alleged robbery victim did not testify. The court said that the comment of the defense counsel invited the retaliatory statement of the prosecutor. We noted that the court there instructed the jury on burden of proof and on the right of defendant not to call any witness. The argument was held not to be erroneous.

There are other cases which recognize the propriety of commenting on the failure to call a witness who has been shown to be potentially helpful so long as the statement made cannot be construed as a comment on the failure of the defendant to testify. *See United States v. Keller*, 512 F.2d 182 (3rd Cir. 1975); *United States v. Hager*, 505 F.2d 737 (8th Cir. 1974); and *United States v. Lipton*, 467 F.2d 1161 (2d Cir. 1972), *cert. denied* 410 U.S. 927, 93 S.Ct. 1358, 35

L.Ed.2d 587 (1973). *United States v. Miller*, 460 F.2d 582 (10th Cir. 1972), held that where the government knows that the uncalled witness would likely invoke the Fifth Amendment right against self–incrimination, it is improper to remark upon failure to testify. Defendants' reliance on this case is unjustified.

■ It is well settled that the attorney prosecuting the case on behalf of the government is authorized to respond to exculpatory arguments made by defendants during closing arguments. *See United States v. Bishop*, 534 F.2d 214 (10th Cir. 1976). The testimony of the witness Ellis, if there is any such testimony, would have very likely elucidated the transaction and the defendants were in the best position to produce information concerning the witness. There is no indication that the government was even aware of the existence of Mr. Ellis prior to trial.

One more comment. There was no objection made to the argument when the argument was made at trial, so it would be most difficult, if not impossible, to predicate reversible error on this incident. *See United States v. Guerrero*, 517 F.2d 528 (10th Cir. 1975).

We do not believe that defendants' final argument that there is a cumulative effect from the three incidents discussed above has merit. They had no particular relation to one another, but if they did the total effect of three weak elements does not make one strong element.

The judgment of the district court is affirmed.