**F I L E D**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JUAN C. SANCHEZ-GARCIA,

    Defendant - Appellant.

No. 04-3437

(D. Kansas)

(D.C. No. 03-CR-20170-CM)

**ORDER AND JUDGMENT** *

Before **LUCERO** , **ANDERSON** , and **MURPHY** , Circuit Judges.

Juan C. Sanchez-Garcia was charged in a five-count Superceding Indictment with possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(b)(1)(B); use of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); being an illegal alien in possession of a firearm, in violation of 18 U.S.C.

---

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

§§ 922(g)(5) and 924(a)(2); and illegal reentry after deportation for an aggravated felony, in violation of 8 U.S.C. § 1326(a) and (b)(2).  Before trial he pleaded guilty to the illegal reentry charge.  Following a jury trial, he was convicted on the remaining four counts.  Sanchez-Garcia then filed a motion for a new trial and for judgment of acquittal notwithstanding the verdict.  The motion was denied and he was sentenced to a term of imprisonment totaling 152 months.  Sanchez-Garcia appeals his conviction on the four counts with respect to which the jury found him guilty, as well as his sentence.  We affirm.

## BACKGROUND

Beginning in May 2002, Sanchez-Garcia and Mirissa Cribbet lived together in Belton, Missouri.  In September 2003, they moved in with Sanchez-Garcia's mother, his sister, Clarissa, and her husband, Andreas, in Kansas City, Kansas.  They left some of their belongings in a storage unit in Belton, Missouri.

Because Sanchez-Garcia's family did not have a car, Cribbet bought a green Dodge Intrepid.  It was registered in her name, but Clarissa and Andreas paid for the car and, at least at times, were the primary drivers.  There was conflicting testimony about who else drove the car and how frequently.  Cribbet testified that she "never . . . drove the car except maybe to go around the block." Tr. of Jury Trial at 38, R. Vol. 3.  Teresa Ketner, Sanchez-Garcia's ex-mother-in-

law, testified that she had seen Cribbet drive the green Intrepid "probably 7 to 10 times," including during the week of September 13 through September 20, the week pertinent to this case. Tr. of Jury Trial at 363, Supp. R. Vol. 3. Cribbet, in turn, further testified that the only person who drove the Intrepid, other than Clarissa and Andreas, was Ketner. However, she also testified that because Sanchez-Garcia was an illegal alien, he was careful to only drive legally registered cars. In September 2003, the green Intrepid was "the single legal functional vehicle that [Sanchez-Garcia] had access to." Tr. of Jury Trial at 60, R. Vol. 3. Cribbet's mother, Debra Davis, testified that she had seen Sanchez-Garcia driving the green Intrepid "a couple of times." Id. at 78.

Sometime prior to September 13, 2003, Cribbet had acquired a gun and given it to Sanchez-Garcia. On September 13, while both were on methamphetamine, Cribbet and Sanchez-Garcia got into a fight, during which Sanchez-Garcia hit Cribbet on the head with a gun that went off, grazing the top of her head. At trial, Cribbet testified that she and Sanchez-Garcia placed the gun used during the fight and another gun in the storage facility in Belton. However, she had previously told Bureau of Alcohol, Tobacco, Firearms and Explosives Agent Charles Backer, an officer investigating this case following Sanchez-Garcia's arrest, that the gun used to strike her on September 13 was one of the guns recovered when Sanchez-Garcia was arrested.

Following the September 13 argument, Cribbet went to a drug rehabilitation center for four days. Cribbet testified that, after her release, she saw Sanchez-Garcia periodically around town, always driving the green Intrepid.

Cribbet agreed to meet Sanchez-Garcia on September 21 at the storage unit in Belton to divide up their belongings. On the evening of September 20, Sanchez-Garcia and Cayenne Caldwell went out together, briefly stopped by the house of an "acquaintance," then returned to Sanchez-Garcia's house. Cayenne testified that, while in Sanchez-Garcia's bedroom, she saw a gun under his bed. After arguing with Sanchez-Garcia's mother, the two slept in the green Intrepid.

The next day, September 21, Cribbet and her mother saw Sanchez-Garcia with Cayenne, in the green Intrepid, driving from the general area of Sanchez-Garcia's mother's house. Cribbet followed them and, while there is a dispute as to which car struck the other, the two cars collided.[1] They continued to drive, however, and Cribbet called 911.

The 911 dispatcher relayed to the responding officers that the driver of the green Intrepid might be armed and dangerous. Trooper Sean Morgan was the first officer to arrive. After pulling the Intrepid over, Morgan displayed his gun and directed Sanchez-Garcia and Cayenne to put their hands up. He then told

---

[1]Cribbet testified that the green Intrepid carrying Sanchez-Garcia appeared out of nowhere and began closely following her car.

-4-

Sanchez-Garcia to get out of the car and he patted Sanchez-Garcia down for weapons. By this time, Trooper James Hilliker and Trooper Chester Kimball, as well as Cribbet, had arrived on the scene. The troopers directed Cayenne to exit the Intrepid, and placed her in Hilliker's car. Trooper Morgan saw a black nylon gun holster in a car seat in the Intrepid's back seat. Cribbet told the officers that the Intrepid was her car, and that her ex-boyfriend, whom she identified as Sanchez-Garcia, had been driving it, and she gave them permission to search it.

As Morgan searched the car for weapons, he lifted up a plastic cover between the driver's and passenger's seats, where he discovered a glass pipe and a brown glass vial containing an off-white substance, which subsequently tested positive for methamphetamine. The troopers found another gun holster while searching the car. After the vial and pipe were found inside the car, Trooper Kimball opened the hood of the car, where he observed two loaded handguns. He then opened the fuse box, inside of which he found a baggie containing a substance later determined to be 12.3 grams of methamphetamine. Officer Hampton also recovered a small straw and a baggie containing methamphetamine from Cayenne. Both Cayenne and Sanchez-Garcia were arrested. The Intrepid was impounded.

At trial, a fingerprint expert testified that there was no identifiable fingerprint evidence on the guns or drugs. There was testimony that DNA from an unknown male was on one of the magazines found with the guns.

Sanchez-Garcia raises six issues on appeal: (1) whether the district court erred when it made no specific reliability findings before allowing Trooper Kimball to testify as an expert on the quantity of drugs being indicative of personal use or distribution; (2) whether certain statements by the prosecutor during closing argument amounted to prosecutorial misconduct and denied Sanchez-Garcia a fair trial; (3) whether the district court erred in allowing testimony regarding the September 13 fight between Sanchez-Garcia and Cribbet during which Sanchez-Garcia struck Cribbet with a gun; (4) whether the evidence was sufficient to sustain his convictions; (5) whether the accumulation of errors denied Sanchez-Garcia a fair trial; and (6) whether Sanchez-Garcia's sentence was erroneous under United States v. Booker, 125 S. Ct. 738 (2005), necessitating a remand for resentencing.

## DISCUSSION

### 1. Trooper's testimony

Trooper Kimball testified on behalf of the government. As indicated, he was one of several officers who responded to the 911 call and participated in the arrest of Sanchez-Garcia. After the vial and pipe were discovered inside the car, it was Kimball who opened the hood and discovered the guns and methamphetamine. At the time of his testimony, Kimball had thirty-four years of law enforcement experience. He testified that he had been involved in "a considerable number" of narcotics investigations. Tr. of Jury Trial at 200, R. Vol. 3. After testifying about the guns he found under the hood, Kimball testified that, based upon his experience with narcotics investigations, the small vial and pipe seized from the car's interior were "more consistent with personal use" than with distribution. Id. at 219. As he began to state "[t]he amounts that I recovered from the —," Sanchez-Garcia's counsel objected to "his qualification to give an expert opinion. If he wants to be made clear that that's his opinion, that's fine. But he's not an expert in what is, quote, distribution, and what is personal use, for purposes of the law. . . ." Id. at 220.

The court then directed the government to "lay more foundation in regards to this witness's testimony as to why he would know or his experiences with drugs that are used for personal use versus drugs that are used for distribution."

-7-

Id. at 221. Kimball accordingly testified that he had taken "some courses," "drug identifications training . . . to prepare us for recovering narcotics in the field." Id. at 222. He further testified that he "keep[s] an extensive computer file of information that's sent out by FBI, DEA, . . . showing different information about what's current with narcotics, and hiding places, and transporting techniques, and so I try to keep current on that stuff." Id.

The government then asked Kimball the following:

Q. Based upon your extensive training, knowledge, and experience and also your education in this area, are there a number of things that someone involved in these types of investigations, things that we look at to determine whether a particular . . . narcotic would be for personal use versus for distribution, are there . . . certain factors or certain things that we look at?

Id. Kimball responded "[u]sually quantity." Id. When the government questioned him specifically about methamphetamine, he responded that "usually small amounts are carried for personal use." Id. at 223. When asked what he considered to be a small amount, Kimball replied "[q]uarter to half a gram maybe." Id. at 224.

The government then had the following exchange with Kimball:

Q. And if there . . . was a larger quantity of 12.3 grams, . . . what might that indicate to you?
A. In this particular item, which I have understood the laboratory has analyzed what we call ice, it's higher grade than most methamphetamines. I don't know a value pricing for ice, but for common meth that we normally get, talking to people that know the

price range, street ranges, that they guessed this is going to be at least 12 hundred dollars worth.

Q. Okay. And — and so, 12 point — that would equate, if it was just straight methamphetamine, to about a hundred dollars per gram?

A. On straight methamphetamine, just street methamphetamine made in the house or something.

Q. And ice being a higher grade of methamphetamine, would you expect that to be at a higher price?

A. I would expect it, but I don't know the pricing on ice.

Q. Okay. And . . . the quantity of 12.3 grams, . . . based upon your knowledge, training, experience, and education, would that be more indicative of personal use or more indicative of distribution?

A. It would be my opinion that that is more for distribution.

Id. at 224-25. Kimball also testified that it is "[m]uch more common" to find weapons "in connection with . . . narcotics that are being distributed." Id. at 225.

On cross-examination, the following colloquy occurred:

Q. Now, I believe the amount of methamphetamine in the car was 12.3 grams. Is that your understanding?

A. That's my understanding, yes, ma'am.

Q. And how many grams are there in an ounce?

A. I don't know, ma'am.

Q. If someone used an ounce a day of methamphetamine, would they be a pretty big methamphetamine user?

A. I don't know how to make the comparison, ma'am.

Q. So, you don't know what's a lot and what's a little?

A. I would assume anybody who uses any illegal drugs to be an abuser.

Q. Well, you testified —

A. I don't know how much an ounce is in grams.

Q. So, you testified that you think a usual user amount might be half a gram?

A. That's what I've been told, yes, ma'am.

Q. That's what you've been told?

A. Yes, ma'am.

Q. And so, 12.3 grams for someone who does a half a gram a day would be about 24 days, right?

A.  If that's the math, yes, ma'am.

Id. at 226-27.

"The trial court's admission of expert testimony, over a timely objection, is reviewed for an abuse of discretion."  United States v. Velarde, 214 F.3d 1204, 1208 (10th Cir. 2000).  Sanchez-Garcia argues the district court abused its discretion when it allowed Kimball to testify that the quantity of methamphetamine seized indicates an intent to distribute without making a determination on the record as to the reliability of that testimony.  We disagree.

Fed. R. Evid. 702 governing the admission of expert testimony provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. . . .

We have acknowledged that "evidence on the significance of an amount of [drug] is specialized."  United States v. Muldrow, 19 F.3d 1332, 1338 (10th Cir. 1994); see also United States v. McDonald, 933 F.2d 1519, 1522 (10th Cir. 1991).  We have also acknowledged that a law enforcement officer, with appropriate experience and training, may be qualified to testify as to such matters.  Further, we have not always required explicit on-the-record reliability findings.  Indeed, in McDonald, the expert was an experienced law enforcement officer who testified

-10-

as to the significance of the quantity of drug at issue, as well as the "drug dealer's tools of trade."  McDonald , 933 F.2d at 1522.  We found no error in the district court's failure to make formal findings as to his expertise:

> We realize the trial court never formally accepted the police officer as an expert witness.  However, the court heard the witness describe his qualifications, including his specialized knowledge, education, skill and experience, and then allowed the witness to give opinion testimony.  We therefore assume the witness was accepted as an expert witness by the trial court.

Id. at 1522 n.2.  We similarly hold that the district court in this case did not abuse its discretion in permitting Trooper Kimball to testify as to the significance of the two different quantities of drugs seized in this case, as well as to testify that the presence of firearms near the drugs was suggestive of distribution, rather than personal use. [2]

---

[2]Furthermore, as the government points out, two of the other officers testified, without objection by defense counsel, about the quantity of drugs seized being suggestive of personal use versus distribution, as well as the significance of the presence of firearms.  Trooper Morgan testified that the vial of methamphetamine and the pipe discovered inside the car were consistent with personal use.  Overland Park Police Officer Brian Hampton, who also responded to the 911 call and was at the scene of Sanchez-Garcia's arrest, testified that "gram, quarter gram, those type amounts . . . are personal use amounts."  Tr. of Jury Tr. at 309, Supp. R. Vol. 3.  By contrast, "half ounce, ounce, quarter pound, obviously those are not in my experience possessed for simple possession or for simple use.  Those are possessed for distribution."  Id. at 309-10.  He also testified that there are 28.3 grams in an ounce, and that 12.3 grams (the quantity found under the hood of the Intrepid) was "a little less than a half an ounce."  Id. at 311.  Finally, Officer Hampton  testified that it was "not uncommon for a drug dealer to have a gun."  Id. at 313.

## 2. Closing argument statements

Sanchez-Garcia argues that several statements made by the prosecution in closing arguments were improper and therefore denied him a fair trial. The first statement was as follows:

> The government's evidence established that following an incident on September 13th, no one other than this defendant was in possession of that vehicle [the Intrepid]. Now, during the course of this case, the defense brought a single witness forward to bring forth evidence that Mirissa Cribbet had had possession of that vehicle. Although there were a number of other witnesses who according to this one witness had seen the same thing, that single witness was called to indicate —

Tr. of Closing Arg. at 2, R. Vol. 1, tab 70. At that point, defense counsel objected, to which the court responded, "[t]hese are closing statements."      Id.

Later in her closing statement, the prosecutor stated, "[t]here was no information provided by any witness, including the defendant, to Agent Backer during this interview to suggest anyone else planted these items there, to suggest that someone else might be responsible."      Id. at 8. At the end of the prosecution's initial closing argument, defense counsel made another objection, asserting that "the prosecution may not make any comment on lack of evidence by the defendant or any time the defendant does not give evidence or denies evidence."      Id. at 10. Defense counsel requested a cautionary instruction. The court did not give such an instruction, but did remind the jury that "what counsel says during their closing arguments are not evidence" and further reminded the jury that the jury

-12-

instructions they had been given "are your instructions in regards to what the law states, and you are the ones to decide what the facts are from the evidence that you received." Id. at 12.

In her rebuttal closing argument, the prosecutor made the following statement:

> Well, do you remember the testimony of Cayenne Caldwell when I asked her what they did the night before, and she said they'd went out to eat and then they stopped by an acquaintance's house? And I said oh, was that a friend? She said no, an acquaintance. Well, were you there a long time? No, just a short time. Well, if there had just been a drug pick-up made, the drugs were hidden and they hadn't been cut up yet for distribution.

Id. at 14. Defense counsel objected, and the court informed the jury that "these are arguments, and one of your instructions are that you can, if you so choose, make an inference in regards to what the evidence may or may not have shown to you." Id.

The final statement Sanchez-Garcia claims was improper was the prosecutor's comment at the end of her rebuttal urging the jury to "use your common sense, go back there, find this defendant guilty of the four crimes he's charged with. He doesn't get the benefit of the doubt in this case." Id. at 17. Sanchez-Garcia did not object to this statement. He did, however, object to all three statements in his motion for a new trial, which the district court denied. Sanchez-Garcia argues that, "[t]aken as a whole, the closing argument included

-13-

drawing attention to the defendant's failure to offer testimony both as to himself and other witnesses and, most egregiously, stated that the defendant was not entitled to reasonable doubt." Appellant's Br. at 24.

As indicated, Sanchez-Garcia objected to the first three instances of alleged prosecutorial misconduct, but failed to object to the last. He did not request a new trial on the ground of that alleged misconduct until after the jury verdict had been returned. "Generally, this court reviews de novo whether prosecutorial misconduct occurred, which is a mixed question of law and fact." United States v. Magallanez, 408 F.3d 672, 679 (10th Cir. 2005) (further quotation and alteration omitted), petition for cert. filed, (U.S. Sept. 7, 2005) (No. 6316). However, we review for plain error where "no objection was lodged at trial on this point." Id. at 679-80; see also United States v. Dazey, 403 F.3d 1147, 1170 (10th Cir. 2005). [3]

We employ a two-step process to evaluate claims of prosecutorial misconduct to which a contemporaneous objection was made. "'We must first examine whether the prosecutor's conduct was in fact improper, and if so, then determine whether . . . [the error was] . . . harmless beyond a reasonable doubt.'" United States v. Pulido-Jacobo, 377 F.3d 1124, 1134 (10th Cir.) (quoting United

---

[3]Where there is a contemporaneous objection and a motion for a new trial, we review the district court's resolution of that question for an abuse of discretion. United States v. Gabaldon, 91 F.3d 91, 93 & n.1 (10th Cir. 1996).

States v. Martinez-Nava, 838 F.2d 411, 416 (10th Cir. 1988)), cert. denied, 125 S. Ct. 679 (2004). The government bears the burden of showing that a constitutional error is harmless beyond a reasonable doubt. Id. In determining whether prosecutorial misconduct is harmless, "'we must look to the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case as a whole.'" Id. (quoting Martinez-Nava, 838 F.2d at 416).

We turn first to whether the prosecutor's conduct was improper. "It is improper for a prosecutor to comment on a defendant's decision to refrain from testifying at trial." Battenfield v. Gibson, 236 F.3d 1215, 1225 (10th Cir. 2001) (citing Griffin v. California, 380 U.S. 609, 615 (1965)). Thus, "[i]f a prosecutor's remarks concern matters that could have been explained only by the accused, they give rise to an innuendo that the matters were not explained because [defendant] did not testify and, thus, amount to indirect comment on the defendant's failure to testify." Id. (further quotation and alteration marks omitted). However, a prosecutor remains "otherwise free to comment on a defendant's failure to call certain witnesses or present certain testimony." Trice v. Ward, 196 F.3d 1151, 1167 (10th Cir. 1999). Further, the prosecutor "may comment on the lack of evidence in a case," United States v. Rahseparian, 231 F.3d 1267, 1273 (10th Cir. 2000), and "impeach a defendant's trial testimony with prior inconsistent statements." United States v. May, 52 F.3d 885, 890 (10th Cir.

1995). "The question is whether the language used by the prosecutor was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the defendant's right to remain silent." Battenfield, 236 F.3d at 1225 (further quotation and alteration marks omitted).

In this case, Sanchez-Garcia's basic defense at trial was that the guns and drugs were not his, and that other people, in particular Cribbet, had access to the Intrepid and opportunity to put the guns and drugs under the hood. However, the defense presented only one witness, Teresa Ketner, who testified that she had seen Cribbet in the Intrepid during the week prior to Sanchez-Garcia's arrest. Although Ketner herself indicated that others had also seen Cribbet in the Intrepid during that time period, no other witnesses were called to so testify. Agent Backer testified at trial that, when he interviewed Sanchez-Garcia shortly after his arrest, Sanchez-Garcia denied that the guns and drugs were his. Backer testified that Sanchez-Garcia "claimed that he had no knowledge of how they'd gotten there." Tr. of Jury Trial at 340, Supp. R. Vol. 3. Thus, the prosecutor's first three comments are fairly characterized as comments or argument regarding the evidence and inferences to be drawn therefrom. They were not "manifestly intended" to be comments on Sanchez-Garcia's right not to testify, nor would the jury "naturally and necessarily" take them to be such. The prosecutor therefore committed no misconduct when she made those three statements.

-16-

The last comment is, on its face, more troublesome. The statement that Sanchez-Garcia "doesn't get the benefit of the doubt" evokes either the presumption of innocence to which all accused are entitled or the beyond-a-reasonable-doubt standard necessary for conviction. The government argues this comment was in direct response to defense counsel's closing argument, in which defense counsel stated as follows:

> After considering all the evidence, ladies and gentlemen of the jury, the defense submits that you cannot find my defendant guilty beyond a reasonable doubt. The proof must leave you firmly convinced. This is all from the jury instructions. If there is a real possibility that the defendant is not guilty, you must give him the benefit of the doubt and find him not guilty. If you — again from the instructions, if you view the evidence as reasonably permitting either of two conclusions, one of innocence, the other of guilt, you must, of course, adopt the conclusion of innocence. The defense requests, do not convict my client based on this lack of admissible evidence. Do not convict him if you would hesitate in the graver and more important transactions of life based on this, because it is one of the graver and more important transactions and decision of your life, and it certainly is to my client.

Tr. of Closing Arg. at 9-10, R. Vol. 1, tab 69. The prosecutor's rebuttal began with a response to defense counsel's closing argument:

> Miss Harrison suggests that the government wants you to convict the defendant based only on the testimony and evidence from Mirissa Cribbet and Cayenne Caldwell. At no time have I suggested that you find him guilty because of the evidence from them. What I've asked you to consider is all of the evidence in this case, not to piece-meal it out, not to look at just one or two aspects of this case.

Tr. of Closing Arg. at 13, R. Vol. 1, tab 70. The prosecutor then discussed all the evidence she believed supported conviction before concluding with the remarks to which Sanchez-Garcia now objects.

Because, as indicated, Sanchez-Garcia failed to object to the prosecutor's statement, we review it for plain error. To establish plain error, Sanchez-Garcia must show (1) that the district court: "committed error, (2) that the error was plain, and (3) that the plain error affected his substantial rights." Dazey, 403 F.3d at 1174. "If all these conditions are met, a court reviewing the error may exercise discretion to correct it if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. We have acknowledged the difficult burden facing a defendant on plain error review: "Plain error must be so 'egregious' as to result in a 'miscarriage of justice.'" United States v. Hernandez-Muniz, 170 F.3d 1007, 1011 (10th Cir. 1999). Further, on plain error review, "[t]he stronger the case against the defendant, the less likely it is that the misconduct constitutes plain error." Mason v. United States, 719 F.2d 1485, 1490 (10th Cir. 1983). Finally, the prosecutor's comments must be considered "in the context of the entire case." Hernandez-Muniz, 160 F.3d at 1011.

Several factors cause us to conclude that, while it was error for the prosecutor to make the remark that she did, and while that error was plain, the comment was not so egregious that it caused a miscarriage of justice compelling

us to grant relief on plain error review. See Dazey, 403 F.3d at 1171. First, it is clear that the prosecutor was responding to defense counsel's plea to give Sanchez-Garcia "the benefit of the doubt and find him not guilty." "We have stated that '[p]rosecutors have considerable latitude to respond to an argument made by opposing counsel.'" Patton v. Mullin, 2005 WL 2293757, at *23 (10th Cir. 2005) (quoting Hernandez-Muniz, 170 F.3d 1012); see also United States v. Merryman, 630 F.2d 780, 789 (10th Cir. 1980) ("It is well settled that the attorney prosecuting the case on behalf of the government is authorized to respond to exculpatory arguments made by [the] defendant[] during closing arguments.").

Second, the district court reminded the jury during closing arguments that counsel's arguments are not evidence and further reminded them that the jury instructions were their guide in evaluating the evidence. Those instructions, in turn, reiterated that "before convicting a defendant, the jury [must] be satisfied of the defendant's guilt beyond a reasonable doubt." Jury Instr. No. 5, R. Vol. 1, tab 64. Further, instruction No. 8 stated that:

> The fact that the defendant, Juan C. Sanchez-Garcia, did not take the witness stand and testify in his own behalf does not create any presumption against him. You are charged that you must not permit that fact to weigh in the slightest degree against the defendant, nor should it enter into your discussions or deliberations in any manner.

Id. Jury instruction Nos. 9 and 10 discussed the government's burden to prove defendant's guilt beyond a reasonable doubt. Instruction No. 9 includes the

language used by defense counsel in her closing argument, to which the prosecutor responded with the statement at issue: "If . . . you think there is a real possibility that the defendant is not guilty of the crimes charged, you must give him the benefit of the doubt, and find him not guilty of those crimes."     Id. Instruction No. 14 reminded the jury of the presumption of innocence: "The law presumes the defendant to be innocent of crime.  This presumption remains with the defendant throughout the trial."     Id.  We presume jurors follow the court's jury instructions.   Battenfield , 236 F.3d at 1225;   see also  United States v. Kravchuk , 335 F.3d 1147, 1154 (10th Cir. 2003) (finding that "the district court's instructions cured any potential defect caused by the prosecutor's comments").

Sanchez-Garcia relies upon   Mahorney v. Wallman  , 917 F.2d 469 (10th Cir. 1990) (per curiam) in support of his argument that the prosecutor's comment was erroneous.  In  Mahorney , the prosecutor made improper statements concerning the presumption of innocence in voir dire, as well as in closing arguments.  We granted habeas relief, finding that the improper comments undermined the defendant's constitutionally-based presumption of innocence.  The comments in

-20-

Mahorney were much more egregious than those here. [4] That case does not convince us that Sanchez-Garcia's conviction should be reversed.

We therefore conclude the prosecutor's last comment to the jury was not "sufficiently egregious or prejudicial to warrant reversal under the plain error standard of review." Dazey, 403 F.3d at 1171.

### 3. Admission of testimony about prior altercation

Prior to trial the government filed a notice and accompanying memorandum seeking permission to present evidence of Sanchez-Garcia's prior

_____

[4]In Mahorney, the prosecutor stated the following in his rebuttal closing argument:

> I submit to you, under the law and the evidence, that we are in a little different position today than we were when we first started this trial and it was your duty at that time, under the law of this land, as you were being selected as jurors, to actively in your minds presume that man over there not to be guilty of the offense of rape in the first degree, but, you know, things have changed since that time. I submit to you at this time, under the law and under the evidence, that that presumption has been removed, that that presumption no longer exists, that that presumption has been removed by evidence and he is standing before you now guilty. That presumption is not there any more.

Mahorney, 917 F.2d at 471.

possession of guns and drugs. The government described the September 13 incident:

> On September 13, 2003, the defendant and Mirissa Cribbet were at a residence in Kansas City, Kansas, when they became involved in an argument. The defendant was in possession of a firearm and struck Ms. Cribbet in the head. The firearm discharged and caused a grazing wound to Ms. Cribbet's head. Ms. Cribbet's description of this firearm is identical to one of the weapons recovered on September 21, 2003.

Gov.'s Mem. in Support of Rule 404(b) Evid. at 7-8, Supp. R. Vol. 1, tab 52. The government asserted that this evidence was relevant to "establish[] [the] relationship of the parties and to complete the story of the crime by showing the circumstances surrounding the crime." Id. at 1-2. The government further argued it was

> proper to prove his opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident in the case at hand. This evidence will also serve to dispel any assertion by the defendant that Mirissa Cribbet or someone else was somehow responsible for the weapons and methamphetamine in the vehicle he had, by his own admission, had exclusive possession of for several days prior to the instant offense.

Id. at 10. Sanchez-Garcia objected to the admission of this evidence, questioning its relevancy and credibility and asserting it would be prejudicial.

The district court ruled the evidence would be admissible, finding it "permissible to show defendant's opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident in this case, pursuant to

-22-

Rule 404 B." Tr. of Mots. at 19, Supp. R. Vol. 2, tab 83. The court further ruled that the evidence was relevant "to establish the circumstances surrounding the current offenses." Id. at 20. The court made it clear that its decision to admit the testimony was based on Rule 404(b) alone and that it would not rule on any other basis for its admissibility until the evidence was offered to the jury. Cribbet accordingly testified about the incident, including stating that she subsequently placed the gun involved in the storage unit in Belton, Missouri. Sanchez-Garcia appeals the district court's decision to admit that evidence.

We review a district court's decision to admit or exclude evidence for an abuse of discretion. United States v. Thomas, 410 F.3d 1235, 1244 (10th Cir. 2005). "We will not overturn an evidentiary ruling 'absent a distinct showing that it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment.'" Id. (quoting United States v. Jenkins, 313 F.3d 549, 559 (10th Cir. 2002)).

Fed. R. Evid. 404(b) "provides that evidence of other crimes, acts, or wrongs is not admissible to prove character but may be offered to prove 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" Chavez v. City of Albuquerque, 402 F.3d 1039, 1046 (10th Cir. 2005) (quoting Fed. R. Evid. 404(b)). To be admissible, such evidence must satisfy four factors: "(1) the evidence is offered for a proper purpose; (2) the

evidence is relevant; (3) the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice; and (4) the district court provides an appropriate limiting instruction upon request." Id.

The government argues that, because Sanchez-Garcia failed to object at trial to Cribbet's testimony about the September 13 incident, he has waived his objection. If it is not deemed waived, the government argues the district court properly admitted the evidence because it was "relevant to establish the relationship of the parties and to give a complete background of what led up to the encounter between Sanchez-Garcia and Ms. Cribbet on September 21st." Appellee's Br. at 27. We agree. Assuming Sanchez-Garcia has properly preserved this issue, we conclude the district court did not abuse its discretion in admitting Cribbet's testimony concerning her September 13 encounter with Sanchez-Garcia.

### 4. Sufficiency of evidence

Sanchez-Garcia argues there is no evidence that he knowingly possessed the drugs and guns found in the car, nor was there evidence that the guns were "possessed in furtherance of drug trafficking except that they were found close to the drugs." Appellant's Br. at 34.

We review *de novo* the sufficiency of the evidence. United States v. Brown, 400 F.3d 1242, 1247 (10th. Cir.), cert. denied, 2005 WL 1410577 (U.S. Oct. 3, 2005). In conducting that review

> [w]e ask only whether taking the evidence — both direct and circumstantial, together with the reasonable inferences to be drawn therefrom — in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt. We do not assess the credibility of witnesses or weigh conflicting evidence since these tasks are exclusively those of the jury. We may reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Id. (internal quotation marks and citations omitted).

The government concedes that there was no evidence directly establishing that Sanchez-Garcia possessed the guns and drugs. However, it argues there was ample circumstantial evidence establishing that Sanchez-Garcia "was the individual responsible for putting them in their location and to being in constructive possession of the items." Appellee's Br. at 32. We agree. Sanchez-Garcia had been seen driving the Intrepid in the days prior to his arrest, including the night before. He had briefly stopped at the house of an "acquaintance" the night before, he had been seen the night before and the week before in possession of a gun, he was using methamphetamine, and there was no evidence, circumstantial or otherwise, to suggest that anyone else had stashed the guns and drugs in the car. Bearing in mind our standard of review, and in light of the fact that we must view the evidence in the light most favorable to the government, we

-25-

find there was sufficient evidence from which the jury could conclude that Sanchez-Garcia possessed the guns and drugs.

Sanchez-Garcia also argues there was insufficient evidence establishing that he possessed the guns "during and in relation to" or "in furtherance of" drug trafficking, as required by 18 U.S.C. § 924(c)(1)(A). "The 'during and in relation to' standard requires the government to prove a direct nexus between the defendant's carrying of a firearm and the underlying drug crime." Brown, 400 F.3d at 1249. "To establish this nexus, we require evidence that the defendant intended the firearm to be available for use in the offense." Id. We have recognized that a gun may be possessed "in relation to" a drug-trafficking offense if it facilitates that offense. Id. at 1250 (citing Smith v. United States, 508 U.S. 223, 237-38 (1993)). There was sufficient evidence from which the jury could conclude that the two loaded weapons near the methamphetamine under the hood of the car which Sanchez-Garcia was driving facilitated the distribution of the drugs. See id. at 1251; see also United States v. Lott, 310 F.3d 1231, 1248 (10th Cir. 2002).

### 5. Cumulative error

Sanchez-Garcia's final challenge to his conviction is that, while no individual error committed by the district court was by itself sufficiently serious

to warrant reversal, the cumulative effect of all the court's errors demands reversal of his conviction. "Cumulative error analysis applies where there are two or more actual errors; it does not apply to the cumulative effect of non-errors." Moore v. Reynolds, 153 F.3d 1086, 1113 (10th Cir. 1998). Because we have identified only one error (the prosecutor's last comment to the jury in closing arguments) we need not engage in a cumulative error analysis.

### 6. Sentence

Sanchez-Garcia argues that his case should be remanded for resentencing in light of United States v. Booker, 125 S. Ct. 738 (2005). At his sentencing hearing, the court determined Sanchez-Garcia had a total offense level of 26 on counts 1, 3, 4 and 5 (the counts relating to possession of methamphetamine, being a felon in possession of a firearm, being an illegal alien in possession of a firearm, and illegal reentry after deportation for an aggravated felony), which, with a criminal history category of 4, yielded a United States Sentencing Commission, Guidelines Manual ("USSG") range of 92-115 months. The court sentenced Sanchez-Garcia to 92 months, the low end of that range. Pursuant to statute, the district court sentenced Sanchez-Garcia to five years on count 2 (use of a firearm during and in relation to a drug trafficking crime) to be served

consecutively to his sentence on the other counts. The court accordingly sentenced him to a total of 152 months' imprisonment.

The district court imposed sentence on Sanchez-Garcia before Booker was decided, but after the Supreme Court's decision in Blakely v. Washington, 542 U.S. 296 (2004). Blakely held that Washington State's sentencing guidelines violated the Sixth Amendment right to a trial by jury because they permitted a defendant's sentence to be increased based upon facts not proved beyond a reasonable doubt. Although Blakely explicitly stated it did not address the federal sentencing guidelines, the district court in this case anticipated the Court's decision in Booker, which applied Blakely's rationale to the federal guidelines. [5] Thus, the district court stated "the Supreme Court's decision in Blakely applies to the United States Sentencing Guidelines" and imposed "an alternative sentence which will not exceed the statutory maximum or fall below the statutory minimum . . . tak[ing] into account those statutory factors to be considered in imposing a sentence under the indeterminate sentencing system." Tr. of Sentencing Hr'g at 6-7, R. Vol. 4.

---

[5]The Supreme Court in Booker held that the Sixth Amendment requires that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Booker, 125 S. Ct. at 756.

The court's alternative sentence mirrored the Guideline sentence: 92 months on counts 1, 3, 4 and 5 and a five-year sentence, to be served consecutively, on count 2, for a total of 152 months. In imposing this alternative sentence, the court stated as follows:

> The court has reviewed the necessary factors to be considered when issuing a sentence under the indeterminate sentencing system, including the nature and circumstances of the offense, the history and characteristics of the defendant, the need to reflect the seriousness of the offense, and the need to afford adequate deterrence, and the need to protect the public from further crimes of the defendant. . . . [The] Court believes this sentence satisfies the sentencing objectives identified by federal statute at 18 U.S.C. § 3553 A 2.

Id. at 15-16, R. Vol. 4. Sanchez-Garcia made no objection to his sentence or his alternative sentence.

Sanchez-Garcia concedes his sentence involved no constitutional error under Booker. He also concedes that, because he made no objection at sentencing, we review this non-constitutional error for plain error only. He nonetheless contends, largely relying upon United States v. Labastida-Segura, 396 F.3d 1140 (10th Cir. 2005), that because the district court applied the Guidelines as mandatory rather than advisory, thereby committing non-constitutional error under Booker, we must remand for resentencing. We disagree.

Sanchez-Garcia overlooks two critical distinctions between this case and Labastida-Segura. First, the defendant in Labastida-Segura preserved his challenge to his sentence by arguing application of the Guidelines violated

-29-

Blakely . Id. at 1142. We therefore reviewed that error for harmlessness, and the government bore the burden of proving the error was harmless. Id. at 1142-43. Here, because Sanchez-Garcia failed to object to the application of the Guidelines, we review only for plain error, and Sanchez-Garcia bears the burden of proving that the plain error affected his substantial rights and convincing us that we should, in our discretion, notice that error because it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Bradford , 2005 WL 2225800, at *9 (10th Cir. 2005). Sanchez-Garcia thus bears a more onerous burden than did the defendant in Labastida-Segura .

Second, while the district court did sentence Sanchez-Garcia to the low end of the Guideline range, as did the court in Labastida-Segura , in this case the court also imposed an alternative, non-Guideline sentence. We are therefore not in the "zone of speculation and conjecture," as we were in Labastida-Segura , 396 F.3d at 1143; rather, we have a very good idea what the district court would do were it not bound by the Guidelines. "A remand would needlessly burden the district court and counsel with another sentencing proceeding, which we know would produce the same result." United States v. Serrano-Dominguez , 406 F.3d 1221, 1224 (10th Cir. 2005).

## CONCLUSION

For the foregoing reasons, Sanchez-Garcia's conviction and sentence are AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge