**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**September 15, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

PAUL DOUGLAS,

     Defendant - Appellant.

No. 05-3343
(D. Kansas)
(D.Ct. No. 03-CR-20063-02-JWL)

_____

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **BRISCOE**, and **O'BRIEN**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.[1]

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1] Necessary documents were absent from the Public Defender's brief and (contrary to counsel's certificate) not included with the electronically submitted brief. Counsel are reminded of the appellant's obligation to attach to the opening brief a copy of all pertinent written findings, conclusions, opinions or orders entered by the district court. 10th Cir. R. 28.2 (A)(1).

On January 20, 2004, Paul Douglas entered a conditional guilty plea to possession with intent to distribute phencyclidine (PCP) in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). He appeals from the district court's denial of his motion to suppress. We AFFIRM.

**Background**:

On May 19, 2003, Trooper David Heim of the Kansas Highway Patrol stopped a Ford Taurus driven by Douglas for failure to signal a lane change. At 2:02 p.m.,[2] Trooper Heim first approached the car and asked Douglas, and his passenger, Mark Seymour, for their licenses and the car rental papers. Douglas' drivers license was broken into two pieces and held together by tape. Heim then asked the men where they were coming from and their destination. Seymour responded they were coming from Los Angeles, California, and heading to Washington, D.C. Heim asked them why they were not flying instead. Seymour responded that they had flown out to California and had rented the car to drive back. Both men wore a suit and tie.

Approximately ninety seconds into the stop, Heim returned to his patrol car and ran the licenses through dispatch to see if there were any outstanding warrants. Heim received an immediate response on Seymour's license stating that

---

[2] When Trooper Heim activated his emergency equipment to pull Douglas over, he also activated a video camera and the entire encounter was videotaped. The video is time-stamped and was admitted into evidence.

it was valid and that there were no outstanding arrest warrants. In the process, Heim discovered Seymour had a prior drug arrest and several armed violent crimes. Heim asked the dispatcher to run Douglas' license against the Washington, D.C. database. Douglas' license came back as not on file.

At approximately 2:08 p.m., after re-running the information with dispatch, Heim returned to the Taurus to talk to Douglas and Seymour. He returned Seymour's license and the rental papers and informed Douglas his license was not on file and asked him if there was a problem with it. Douglas answered no. While talking to Douglas and Seymour, Heim observed a radar detector on the dash of the rental car and detected a very strong caustic chemical odor. He asked them about the smell and whether there were any open alcohol containers in the car.[3] They answered no. Heim also noticed two cologne bottles, one in the back seat and one in the front, along with a hand-rolled cigar in the front seat. Knowing that hand-rolled cigars are sometimes used to conceal marijuana, Heim asked to see the cigar. Seymour produced a package of Backwoods hand-rolled cigars. There was no evidence of marijuana. Suspicious of their travel plans, and nervous about the possible presence of weapons based on Seymour's criminal history, Heim decided to question Seymour and Douglas separately.

---

[3] Heim testified he knew the odor was not alcohol, but asked the question hoping Douglas or Seymour would give him permission to search the vehicle to confirm that there was no alcohol in the car. They did not offer that opportunity.

At 2:11 p.m., nine minutes into the stop, Heim removed Douglas from the Taurus and, because it was raining, had him sit in the passenger seat of the patrol car to question him. Heim asked Douglas about their travel itinerary. Douglas stated he and Seymour had stayed in California for a couple of days to visit Seymour's in-laws. While Seymour was visiting family, Douglas stated he went sight-seeing in southern California. Douglas was unable to provide the names of any of Seymour's relatives.

At 2:13 p.m., Heim left Douglas in the patrol car and returned to the Taurus to ask Seymour the same questions. At 2:15 p.m., Heim returned to the patrol car and confirmed with dispatch that nothing had yet come back on Douglas' license. He then asked Douglas if he had a criminal history or if he was carrying any contraband, such as weapons or drugs. Douglas denied having a criminal history or carrying weapons or drugs.

At 2:19 p.m., eighteen minutes into the stop, Heim again returned to the Taurus and asked Seymour about his criminal history and if he was carrying drugs weapons or other contraband. Seymour admitted he had a criminal history and informed Heim he had no weapons or other contraband. Heim asked Seymour to step out of the car and patted him down for weapons. At this point, Seymour became irritated about the length of the stop and Heim's various questions. Heim attempted to explain his concerns, but Seymour repeatedly interrupted and argued with him. At 2:21 p.m., Heim requested permission to search the car. Seymour

-4-

questioned the necessity of the search and generally refused consent. At some point during this encounter, Heim took possession of the car keys. At 2:22 p.m., Heim returned to his patrol car to request a drug dog, as is his practice in almost every case in which consent to search is refused.[4]

At 2:39 p.m., while waiting for the dog to arrive, Heim returned to the patrol car and again asked Douglas about his license. Douglas volunteered that his license number was the same as his social security number. Heim again contacted dispatch to check the license and again emphasized the license was from Washington, D.C. At this point, Heim realized dispatch had mistakenly been running the license through Washington state. When the mistake was corrected, the license came back as valid. At 2:44 p.m., Heim apologized for the delay and finished issuing a warning citation for the failure to signal a lane change.

At 3:01 p.m., fifty-nine minutes into the stop, the drug dog arrived with its handler. It alerted to the trunk of the Taurus. The trunk was opened at 3:03 p.m. and contained approximately 3,591 milliliters of PCP (with a net weight of 2,621

---

[4] There is some inconsistency in the record as to the precise time of the call for the drug dog. In his brief, Douglas lists the call for the drug dog as occurring shortly after 2:22 p.m. (Appellant's Br. at 6.) According to Heim's testimony at the hearing, he called for the drug dog after issuing the warning citation to Douglas, which would place the request after 2:44 p.m. (R. Vol. IV at 20-21.) However, Heim also stated he waited for the drug dog for over thirty minutes, which would place the call prior to 2:30 p.m. (*Id.* at 22.) The videotape provided in the record places the call at 2:24 p.m. (R. Vol. VI.)

grams) and 435.8 grams of marijuana.

On May 28, 2003, Douglas was indicted on one count of possession with intent to distribute PCP and one count of possession with intent to distribute marijuana. At trial, he moved to suppress all evidence seized from the search. The district court denied the motion holding there was a reasonable basis to call for a drug dog and the total delay was not unreasonable. Douglas subsequently entered a conditional guilty plea, preserving his right to appeal the suppression ruling. He was sentenced to twenty-four months imprisonment.

**Discussion**:

"In reviewing the denial of a motion to suppress, we accept the factual findings of the district court unless they are clearly erroneous." *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) (citation omitted). "However, we review *de novo* the ultimate determination of the reasonableness of the search under the Fourth Amendment." *United States v. Bustillos-Munoz*, 235 F.3d 505, 511 (10th Cir. 2000) (citation omitted). "We view the evidence in the light most favorable to the district court's determination." *United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997).

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable." *Wilson v.*

*Arkansas,* 514 U.S. 927, 931 (1995) (quotation omitted). A routine traffic stop is analogous to an investigative detention and is analyzed under the principles enunciated in *Terry v. Ohio,* 392 U.S. 1 (1968). *United States v. Caro,* 248 F.3d 1240, 1244 (10th Cir. 2001). We undertake a two-step inquiry to determine the constitutionality of an investigative detention. First, we determine whether the police officer's action was justified at its inception. *Terry*, 392 U.S. at 20; *Caro*, 247 F.3d at 1244. Second, we consider whether the action was reasonably related in scope to the circumstances which justified the interference in the first place. *Id.*

"An investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." *Wood*, 106 F.3d at 945. During a routine traffic stop, a police officer may request a driver's license and vehicle registration, run a computer check, and issue a citation as a matter of course. *Id.*; *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995). Moreover, an officer may ordinarily ask questions relating to a driver's travel plans without exceeding the scope of a traffic stop. *United States v. Williams,* 271 F.3d 1262, 1267 (10th Cir. 2001). The officer may even go further, inquiring into matters unrelated to the stop. *Muehler v. Mena*, 544 U.S. 93, 101 (2005). "Even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification;

-7-

and request consent to search his or her luggage." *Id*. (*quoting Florida v. Bostick*, 501 U.S. 429, 434-35 (1991)). The officer may also obtain information regarding the detainee's criminal history. *United States v. McRae*, 81 F.3d 1528, 1536 n.6 (10th Cir. 1996). "When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning." *United States v. Sandoval*, 29 F.3d 537, 549 (10th Cir. 1994). Thus, after completing these activities, an officer may continue to detain a driver only if: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2) the detention has become a consensual encounter. *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004).

Two matters are conceded. Trooper Heim's initial stop for failure to signal a lane change was justified and the initial detention never became a consensual encounter. The first issue, therefore, is whether length of the delay was necessary to effectuate the purpose of the stop. *See Wood*, 106 F.3d at 945. While a one hour detention on its face appears to exceed the scope of a routine traffic stop, in this case it was necessary. Upon being validly stopped for a failure to signal a lane change, Douglas presented a mutilated license that came back as not on file because of a dispatch error. Approximately thirty-eight minutes transpired between the initiation of the stop and validation of Douglas' license. During that period, Trooper Heim faced the dilemma of releasing (or arresting) Douglas

without adequately testing his claim that he had a valid license. *See United States v. Lee*, 73 F.3d 1034, 1039 (10th Cir. 1996) (requiring prompt release where driver has produced a *valid* driver's license). While the error and resultant delay was not attributable to Douglas, neither was it attributable to Heim who rechecked the validity of the license at least four times and repeatedly informed dispatch the license was from Washington D.C. *See United States v. Place*, 462 U.S. 696, 709-10 (1983) ("[I]n assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation."). Trooper Heim was thus justified in perpetuating the stop long enough to determine whether the license was in fact valid. *See United States v. Rutherford*, 824 F.2d 831, 834 (10th Cir. 1987) (one-hour investigative stop prior to arrest upheld when nearly one half-hour was due to problems with the police computer, and officers had received tip that implicated defendant in drug trafficking, defendant failed to stop when signaled by police, and there were inconsistencies between vehicle's license plate and registration); *United States v. Shareef*, 100 F.3d 1491, 1501-02 (10th Cir. 1996) (Where, *inter alia*, police "computers used to verify license information were down or slow" and the driver was not carrying a license, "a detention of thirty minutes, given the totality of the circumstances . . . was reasonable.").

Because Douglas was not permitted to leave as soon as the warning ticket was issued we next must consider whether Heim had a reasonable and articulable

suspicion of criminal activity such that the continued detention of Douglas did not offend the Fourth Amendment. In conducting this inquiry, we consider the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 299 (2002); *United States v. Bradford*, 423 F.3d 1149, 1157 (10th Cir. 2005); *United States v. Salzano,* 158 F.3d 1107, 1111 (10th Cir. 1998). We recognize a law enforcement officer's experience and training help to distinguish between innocent and suspicious actions. *United States v. Lopez-Martinez*, 25 F.3d 1481, 1484 (10th Cir. 1994). Reasonable suspicion may be founded on factors consistent with innocent travel. *United States v. Sokolow*, 490 U.S. 1, 9-10 (1989). While patently innocent or wholly ambiguous conduct may do little to inform the debate, they are part of the calculus and may not be categorically disregarded.[5]

During the thirty-eight minutes required to verify the validity of Douglas' license, Trooper Heim limited himself to permissible questioning of Douglas and Seymour. During the questioning, Heim uncovered: 1) passengers with an unusual travel itinerary, *see Wood*, 106 F.3d at 946-47,[6] 2) from a known source

_____

[5]*United States v. Arvizu*, 534 U.S. 299 (2002), effectively overruled *United States v. Wood*, 106 F.3d 942 (10th Cir. 1997), regarding *Wood's* proposition that we pick through all of the facts the trooper relies on, discard the innocent facts and then see if there is anything left to support a reasonable articulable suspicion. *Id.* at 947. We must look at the totality of the facts, the innocent with the incriminating, in our reasonable articulable suspicion analysis.

[6] "[U]nusual travel plans may provide an indicia of reasonable suspicion." *Wood*, 106 F.3d at 946-47; *see Sokolow*, 490 U.S. at 9 (forty-eight hour stay in Miami after a twenty-four hour flight from Honolulu was unusual and supported reasonable suspicion).

city for illegal drugs, *Illinois v. Gates*, 462 U.S. 213, 243 (1983),[7] 3) Douglas'

inability to provide details about the trip, *Wood*, 106 F.3d at 947, 4) the

inexplicable presence of a strong chemical odor, *United States v. Ozbirn*, 189

F.3d 1194, 1200 (10th Cir. 1999),[8] 5) the presence of a potential masking agent in

the form of two cologne bottles, *West*, 219 F.3d at 1178-79, and 6) a passenger

with a criminal record, *United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir.

2005),[9] who became increasingly confrontational as the stop progressed. Viewing

the totality of the circumstances, *Bradford*, 423 F.3d at 1157, we agree with the

district court that all of the factors in this case gave rise to reasonable suspicion

of illegal activity warranting the call for a drug dog.[10] Given the presence of

---

[7] *But see Williams,* 271 F.3d at 1270 (traveling from a source city, standing alone is "at best, a weak factor in finding suspicion of criminal activity").

[8] We afford this factor less weight in this case than we might otherwise because Trooper Heim could not identify the smell as consistent with a specific illegal substance. *See United States v. Sweeney*, 688 F.2d 1131, 1137 (7th Cir. 1982) (officer must be able to identify odor to establish probable cause for a search warrant). However, an unexplained strong caustic chemical smell emanating from a vehicle may support a general suspicion that the occupant is transporting illegal materials of some form. Coupled with other factors, it could amount to probable cause.

[9] "[I]n conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus." *Santos*, 403 F.3d at 1132. Standing alone, however, we accord this factor little weight, lest "any person with any sort of criminal record . . . could be subjected to a *Terry*-type investigative stop by a law enforcement officer at any time without the need for any other justification at all." *Sandoval*, 29 F.3d at 543.

[10] We note three additional factors advanced by the government as supporting reasonable suspicion: both Douglas and Seymour were wearing a suit and tie, they had a radar detector in their rental car, and Seymour was unfamiliar with the term "blunt" in spite of his criminal record. Wearing a suit and tie may be unusual attire for a cross-

reasonable suspicion of illegal activity, a thirty-minute delay to await the arrival of the drug dog was not unreasonable. *See United States v. Villa-Chaparro*, 115 F.3d 797, 802-03 (10th Cir. 1997) (thirty-eight minute wait for drug dog held reasonable).

AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

---

country trip. Trooper Heim testified only that "we don't see that much when people are driving" cross-country and "[w]e have encountered it a couple of times on some interdiction stops." (R. Vol. IV at 17-18.) The presence of a radar detector may be a better indicator of an intent to speed than illegal drug activity. Heim testified that the presence of a radar detector in a rental car was something he does not "see very often." (R. Vol. IV at 12.) *See Williams*, 271 F.3d at 1269 (finding the presence of a two-way radio supports a reasonable suspicion of criminal activity when there was testimony the officer knew from experience that drug traffickers travel in tandem and sometimes use such radios to avoid detection by law enforcement personnel). Seymour's professed unfamiliarity with the term "blunt," is significant only based on Heim's assumption that individuals with criminal histories have a general familiarity with drug terminology. There was no evidence in the record to support this assumption, and Seymour was by all accounts truthful about his criminal history. Those facts may, individually or in combination, be entitled to little weight, but they are necessarily part of the calculus and cannot be categorically ignored. *See supra*, note 5.