**UNITED STATES of America,**
**Plaintiff,**

v.

**John Richard CASTRO, Defendant.**

**No. CR 12–3207 RB.**

United States District Court,
D. New Mexico.

March 14, 2013.

Mick I.R. Gutierrez, United States Attorney's Office, Las Cruces, NM, for Plaintiff.

Cesar Pierce–Varela, Las Cruces, NM, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

ROBERT BRACK, District Judge.

**THIS MATTER** is before the Court on Defendant's Motion to Suppress Evidence and Statements, filed January 24, 2013. (Doc. 36). Having carefully considered the submissions of counsel, and the evidence adduced at the March 4, 2013 hearing, and being otherwise fully advised, the Court **GRANTS** Defendant's motion.

### FINDINGS OF FACT

Federal Rule of Criminal Procedure 12(d) provides that when factual issues are involved in deciding a motion, the Court must state its essential findings on the record. The Court makes the following factual findings based on the evidence adduced at the evidentiary hearing, including the testimony from United States Border Patrol Agents Jonathan Navar and Cesar Flores and Homeland Security Investigations Special Agent David Ferg.

1. On September 1, 2012, Agent Navar, a United States Border Patrol Agent with over five years of experience, all of which has been in the Deming, New Mexico area, seized and ultimately arrested Defendant John Richard Castro.

2. The facts leading to Defendant's arrest are somewhat hazy, and the truth is further obscured by Agent Navar's cut-and-paste report containing self-proclaimed factual inaccuracies and the decidedly deficient presentation at the evidentiary hearing, as described herein. The United States asks this Court to take Agent Navar at his word and to believe his testimony at the hearing, which included purported inconsistent and incriminatory statements by the Defendant. However, none of those inconsistencies or incriminating statements were included in Agent Navar's report. The Court does not believe that a trained law enforcement officer would omit a Defendant's inconsistent or incriminating statement from his report. Additionally, the evidentiary hearing occurred six months after the date of Defendant's arrest. Over the course of those six months, this Court has no doubt that Agent Navar has encountered many citizens and individuals in the course of his work as a Border Patrol Agent, and the Court doubts Agent's Navar's ability to recollect the Defendant's precise words and the timing of those words when nothing about those statements was written down. The Court, therefore, finds Agent Navar's testimony credible solely to the extent that it is consistent with his report[1] or the testimony of Agent Flores.

---

1. No copy of Agent Navar's report was introduced into evidence. Accordingly, the Court's awareness of inconsistencies between the report and the testimony is limited to what was brought out in the course of the evidentiary hearing.

3. On September 1, 2012, Agent Navar was working at a tactical checkpoint on Highway 180 between Deming and Silver City, New Mexico. The checkpoint was located approximately fifty miles from the United States–Mexico border. September 1 was the third day of the checkpoint's operation, and those three days were the first time that the Border Patrol had manned the tactical checkpoint in 2012. Agent Navar provided no information regarding the structure of the checkpoint, the number of agents at the checkpoint, the visibility of the checkpoint to northbound drivers, or any warnings deployed relating to the checkpoint. Agent Navar testified that Highway 180 is a road used to circumvent permanent checkpoints on Interstate 25, Interstate 10, and Highway 26. He testified that legitimate traffic uses the road as well. Indeed, on the day in question, Agent Navar testified that the northbound traffic was extremely heavy due to a bear hunt in Silver City. Just before Agent Navar stopped Defendant, he testified that northbound traffic was so heavy that he could not perform a U-turn when he was a short distance south of the checkpoint.

4. Around 1:40 that afternoon, Agent Navar observed a single vehicle pulled over about a mile south of the checkpoint. Agent Navar did not identify the color, make or model of the vehicle. Agent Navar advised other agents at the checkpoint that there was a vehicle pulled over. As soon as he pointed out the vehicle, it performed a U-turn. Agent Navar then saw two other cars do a U-turn. Agent Navar did not explain whether this was the final opportunity for a car to turn to avoid the checkpoint, nor did he testify regarding whether the cars could, or should, have been aware of the upcoming checkpoint. Agent Navar did not identify the make or model of any of the cars, though he ultimately identified one of the vehicles as a purple Dodge Ram.

5. After witnessing three vehicles perform a U-turn south of the checkpoint, Agent Navar and two other agents got into their units and pursued the vehicles. It is not clear whether there were two or three units pursuing the three vehicles. Agent Navar drove south and saw a purple Dodge truck pulled over on the side of the road. After Agent Navar passed the purple truck, he attempted but was unable to turn around due to the heavy northbound traffic. He instead pulled to the side of the road and waited for the purple truck to continue driving southbound. The purple truck pulled onto Highway 180 and drove south. After it passed Agent Navar, Agent Navar pulled onto the road and followed the truck. When he was behind the truck, he attempted to contact dispatch to request checks on the license plate. However, because the other unit was calling in the checks on one of the other vehicles, he was not able to "get out" using his service radio.

6. According to Agent Navar, he decided to stop the Dodge because it attempted to evade a federal checkpoint, which he stated is a violation of federal law. Based on this purported violation, Agent Navar believed that he had authority to stop and detain the driver of the Dodge.

Agent Navar activated his emergency lights and pulled the Dodge over without incident. Agent Navar testified that he stopped the vehicle around 2:00 in the afternoon, or twenty minutes after witnessing the U-turn. However, he stopped the truck just two miles south of the tactical checkpoint, and, when questioned further, Agent Navar admitted that he did not recall the amount of time that transpired between the U-turn and the stop. Given the short distance and the evidence before the Court, the Court finds that Agent Navar's original estimate was incorrect and that the stop occurred approximately five minutes after Agent Navar witnessed the U-turn.

7. Agent Navar used his personal cellphone to call dispatch to run the plates. Border Patrol agents use a plate check to determine whether a car is stolen, whether it crossed through a port of entry within the previous seventy-two hours, and to whom it is registered. While the checks were running, Agent Navar made contact with the driver. Though Agent Navar failed to identify the Defendant as the driver during the course of the evidentiary hearing, merely stating that the driver provided the name "John Castro," Agent Flores did identify Defendant as the driver of the Dodge truck. The vehicle checks came back clear, though Agent Navar testified that nearly twenty minutes passed before he was contacted by dispatch with the results of the checks.

8. Upon contacting the driver, Agent Navar almost immediately asked the driver to exit the vehicle and give Agent Navar the keys to the truck. The driver complied.

When asked for his identification, the driver indicated he did not have his identification on him, but he did provide his name and date of birth. Once Agent Navar had that information, he attempted to use his service radio to run warrant and immigration checks. However, Agent Navar was again unable to get through to dispatch on his service radio due to the radio traffic. He testified that he used his personal cellphone to call in the check. Usually, it takes approximately five minutes for Agent Navar to receive results of a personal record check. The personal record check for Defendant did not come back until after Defendant had been placed under arrest.

9. Agent Navar continued to speak with Defendant and requested an explanation for Defendant turning around before reaching the checkpoint. Agent Navar testified to a number of statements purportedly made by Defendant. First, he testified that Defendant told him that "he saw the checkpoint and he freaked out." This statement was not in Agent Navar's report. As previously stated, the Court is highly skeptical that a trained and experienced Border Patrol agent would omit such an incriminatory statement from his report, and the Court does not credit Agent Navar's recollection six months after the fact that Defendant told Agent Navar that he saw the checkpoint and freaked out.

10. Second, Agent Navar testified that Defendant explained that he was fixing the transmission on the truck and that it was not his vehicle. This was apparently included in the

report, and the Court deems this testimony credible.

11. Third, Agent Navar testified that Defendant provided a male name when asked about the owner of the truck, when in fact dispatch had advised that the truck was registered to a woman. This inconsistency was not in Agent Navar's report, and, for the reasons previously stated, the Court does not credit Agent Navar's recollection on this point.

12. Finally, Agent Navar pointed out that the Defendant seemed nervous while they were speaking. In support of that conclusion, Agent Navar recalled that the Defendant could not give a straight answer and it took him some time to "actually come up with something to tell me." Agent Navar conceded that he did not know Defendant, and he did not further specify the degree or duration of Defendant's nervousness.

13. At some point during the conversation, Defendant mentioned that he had a "nonextraditable warrant out of another city in New Mexico." However, Agent Navar did not indicate when in the course of the detention Defendant made this statement and, because Agent Navar testified regarding this statement at the conclusion of his testimony and without context, the Court cannot infer when in the course of Defendant's detention this statement was made.

14. Before Agent Navar was able to obtain a response from dispatch regarding Defendant's personal record check, Agent Flores arrived on the scene in a canine unit. The parties strongly dispute whether or not Agent Navar requested the canine unit. Agent Navar's report indicates that he did call for a canine unit. However, both Agent Flores and Agent Navar testified that the canine unit was not requested. Agent Flores, a United States Border Patrol Agent with nearly seven years of experience, credibly testified that he left the Highway 11 checkpoint of his own accord. The Court finds Agent Flores' testimony fully credible and, therefore, concludes that the sentence in Agent Navar's report concerning the request for a canine was incorrect, resulting from Agent Navar's admitted cutting and pasting from prior reports.

15. Agent Navar testified that twenty to thirty minutes passed between the time he stopped Defendant and the time that Agent Flores arrived. However, Agent Flores testified that he was stationed at the checkpoint on Highway 11 when he received notice via radio regarding the three vehicles turning away from the Highway 180 tactical checkpoint. Agent Flores left the Highway 11 checkpoint at that time and began driving to Highway 180. Agent Flores testified that, at a minimum, it would take thirty-five minutes for him to reach the Highway 180 checkpoint. Along the way, Agent Flores stopped where one of the other Border Patrol agents had stopped another vehicle, exited his unit, checked in with the agents there, returned to his unit, and began driving toward Agent Navar and the Dodge truck. Based on those facts, the Court concludes that Agent Navar detained Defendant for at least forty minutes before Agent Flores arrived.

16. Agent Navar explained that, during the stop and before Agent Flores arrived, he spoke with Defendant and told Defendant that he would be free to go once the checks came back. He did not provide any other detail about what he did during the detention. He also did not detail his efforts to run the checks or contact dispatch, merely stating that he could not get through on the radio and used his personal cellphone to call in the check.

17. Once Agent Flores arrived on scene, he requested Defendant's permission to conduct an interior search of the vehicle using his canine. Defendant consented to the search. In less than two minutes, the canine alerted inside the vehicle. Agent Flores searched and found a small bag of a white, powdery substance that appeared to be cocaine. Agent Navar placed Defendant under arrest at that time. After Defendant was arrested, according to Agent Navar, dispatch provided the responses on the personal records check, and all checks were clear. As the search continued, Agent Navar discovered seventy-six pounds of marijuana. A pat-down search of Defendant's person was conducted, and a handgun was discovered. After Defendant's arrest, he spontaneously made a number of incriminating statements. Ultimately, Defendant was charged with possessing 34.47 kilograms of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D) and 18 U.S.C. § 2, and with carrying a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

## LEGAL STANDARDS AND CONCLUSIONS OF LAW

Defendant moves to suppress all physical evidence and statements obtained by the Border Patrol. In support of the motion, he contends that (1) the initial stop was not supported by a reasonable suspicion of criminal activity and (2) the stop was unreasonably prolonged. (Doc. 36). The United States responds that the stop was justified at its inception and the detention was reasonable. (Doc. 39).

■ The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure ... against unreasonable searches and seizures." U.S. CONST. amend. IV. A roving border patrol stop constitutes a seizure, and the individual remains seized for the entire duration of the stop. *United States v. Gandara–Salinas,* 327 F.3d 1127, 1129 (10th Cir.2003) (citations omitted). The United States bears the burden to demonstrate by a preponderance of the evidence that the seizure was justified. *United States v. Burciaga,* 687 F.3d 1229, 1230 (10th Cir.2012) (citation omitted). The allocation of the burden is at the forefront in the Court's consideration of Defendant's motion.

### I. The Stop of Defendant's Vehicle

■ In this case, a temporary border patrol checkpoint was erected and the Defendant made a U-turn, thereby avoiding the checkpoint. Accordingly, the standard applicable to Agent Navar's decision to perform a stop is at issue.

In the Fifth Circuit, reasonable suspicion is not required to stop a vehicle that performs a U-turn prior to reaching a checkpoint. *United States v. Hasette,* 898 F.2d 994, 995 (5th Cir.1990) (citations omitted). Instead, the stop is considered tantamount to a checkpoint stop. *Id.* The Ninth Circuit, on the other hand, treats such stops as roving patrol stops requiring

reasonable suspicion. *United States v. Ogilvie,* 527 F.2d 330, 331 (9th Cir.1975). Our circuit, in the sole case on point, applied a reasonable suspicion analysis to the brief detention of a driver that made a U-turn before a checkpoint, citing to *Ogilvie. United States v. Merryman,* 630 F.2d 780, 782 (10th Cir.1980). However, in *Merryman,* the agent reasonably suspected that criminal activity was afoot based on the totality of the circumstances. *Id.* at 782–84.

 While the Tenth Circuit has never faced the issue head-on, the *Merryman* Court expressly recognized *Ogilvie* and held that its decision was not in conflict with the Ninth Circuit because "[h]ere it is not merely avoidance of the checkpoint. It is the total circumstances which must be looked to in deciding whether an articulable suspicion is present." *Id.* at 784. Given the standard applied in *Merryman,* the Court believes that the Tenth Circuit diverges from the Fifth Circuit and requires that an officer possess reasonable suspicion to stop a vehicle even if the vehicle avoids a checkpoint. Of course, the avoidance of the checkpoint may be considered as part of the reasonable suspicion analysis. However, avoidance of a checkpoint alone, and even in combination with proximity to the border,[2] is not a sufficient foundation on which to rest reasonable suspicion for conducting an investigatory detention.

 In the Tenth Circuit, then, and in contrast to Agent Navar's belief, evading a checkpoint is neither contrary to law nor a valid basis, in and of itself, to perform a stop. Indeed, as the Ninth Circuit has recognized, a driver possesses a legal right to reverse his direction of travel, something that innocent travelers often do for any number of reasons. *Ogilvie,* 527 F.2d at 332. For the stop to be valid, Agent

Navar must have been "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion." *Gandara–Salinas,* 327 F.3d at 1129 (citations and quotations omitted). Reasonable suspicion does "not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu,* 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). However, it must rise above "[i]nchoate suspicions and unparticularized hunches[.]" *United States v. Wood,* 106 F.3d 942, 946 (10th Cir.1997) (citations omitted).

A number of factors may be considered in determining whether an agent had reasonable suspicion to stop a vehicle in the border area, including but not limited to:

> (1) [the] characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*United States v. Cheromiah,* 455 F.3d 1216, 1220–21 (10th Cir.2006) (quotation omitted).

In evaluating the factors, the Court is guided by the "totality of the circumstances" in the case. *See Arvizu,* 534 U.S. at 273, 122 S.Ct. 744 (citing *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). The totality of the circumstances analysis recognizes that, while each factor alone may not constitute

---

**2.** All of the cited cases involve a stop in close proximity to the border.

proof of illegal conduct and may be consistent with innocent behavior, the factors taken together may amount to a reasonable suspicion. *United States v. Sokolow,* 490 U.S. 1, 9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citations omitted). Courts "may not evaluate and reject each factor in isolation," as the "Supreme Court has expressly rejected this sort of 'divide-and-conquer' analysis." *United States v. Williams,* 403 F.3d 1203, 1207 (10th Cir. 2005) (citing *Arvizu,* 534 U.S. at 274, 122 S.Ct. 744). Furthermore, the Court's totality of the circumstances analysis "is made from the perspective of the reasonable *officer,* not the reasonable *person.*" *United States v. Quintana–Garcia,* 343 F.3d 1266, 1270 (10th Cir.2003) (emphasis in original).

In the instant case, Agent Navar failed to articulate any bases for reasonable suspicion aside from the U-turn. Presumably, he failed to discuss the reasonable suspicion factors because he believed that, in turning around prior to the checkpoint, the driver of the vehicle violated federal law. As such, Agent Navar never even stated that he suspected criminal activity aside from his misunderstanding of the law. *See United States v. Matthews,* 458 Fed.Appx. 717, 722 (10th Cir.2012) (unpublished) (reversing order denying suppression when the Government failed to elicit testimony regarding the rationale for reasonable suspicion or even that the officer suspected criminal activity).

■ An officer's mistaken belief that a defendant committed a legal violation does not serve as a valid justification for a seizure. Nevertheless, the Court reviews the facts known to Agent Navar to determine whether reasonable suspicion existed. There is no evidence regarding the characteristics of the area in which the vehicle was encountered, the intelligence regarding recent border crossings, the specific aspects of the vehicle, or the appearance that the vehicle was heavily loaded. However, there are some articulable facts generating suspicion. First, the vehicle was encountered fifty miles from the United States–Mexico border. This is a fact supporting the determination that reasonable suspicion was present.

Second, the pattern of traffic on Highway 180 includes persons using the road to avoid fixed Border Patrol checkpoints. The concern over illegitimate traffic led the Border Patrol to erect and man a tactical checkpoint, which was in operation for the first time that year just days before Defendant was stopped. On the day in question, though, there was heavy legitimate traffic as people traveled to Silver City for a bear hunt. Indeed, Agent Navar stated multiple times that, at the time he performed the stop, traffic was so heavy just south of the checkpoint that he was not able to perform a U-turn to head north on Highway 180.

Finally, there was Defendant's driving behavior, making a U-turn in a possible effort to evade the checkpoint. This U-turn occurred in conjunction with two other vehicles that also performed U-turns. However, given the facts, or lack thereof, adduced at the evidentiary hearing, the Court concludes that Defendant's driving behavior is entitled to very little weight.

First, there is the fact that Defendant performed a U-turn prior to reaching a checkpoint. Turning around before a checkpoint indicates that a driver is attempting to avoid contact with law enforcement if and only if the driver knows that he is, in fact, approaching a checkpoint. The Government failed entirely to establish that a driver one mile from the Highway 180 checkpoint should have been aware that he was approaching a checkpoint. Knowledge of the impending checkpoint is essential to establishing evasive

behavior. There are any number of ways to demonstrate such knowledge.

The Defendant was one mile from the checkpoint, which is not a short distance. Accordingly, to infer awareness of the checkpoint, the Government could have described the terrain of the road within a mile of the checkpoint. If the road was winding and the checkpoint was around a curve in the road, it might not be visible to oncoming traffic. If the checkpoint is at a higher elevation than the rest of the road, it may not be visible at a distance of one mile. If the road was straight and flat, however, a driver might have been aware of the checkpoint. No facts regarding the surrounding terrain were elicited by the Government. The Court is left to speculate about the terrain.

Knowledge could be inferred from the warnings, if any, attendant to the checkpoint. If drivers approaching the checkpoint were approaching at a high rate of speed, there likely would be warnings beginning some distance from the checkpoint alerting drivers to reduce their speed. If Highway 180 was a multi-lane highway, there might have been traffic cones and signs reducing traffic to a single lane. If the checkpoint used signs with flashing lights, a driver might be able to see the signs from some distance. If there were merely signs within one or two hundred yards of the checkpoint, no driver could know that he was nearing a checkpoint from a mile away. The United States presented no evidence regarding the warnings utilized by the Highway 180 checkpoint.

The visibility of the checkpoint from a distance could be established by describing the structures included as part of the checkpoint. Permanent checkpoints often include large buildings, many marked Border Patrol vehicles of different sorts, and shelters to shade agents and passing vehicles. Temporary checkpoints sometimes have similar developed structures. However, temporary checkpoints may also consist of a few Border Patrol vehicles on the side of the road. The structures related to the checkpoint could help demonstrate that oncoming traffic was aware of the checkpoint well in advance. The Government never asked Agent Navar to describe the set-up of the Highway 180 tactical checkpoint.

Other facts relevant to determining whether a driver performing a U-turn prior to reaching a checkpoint did so for purposes of evasion include the traffic passing through the checkpoint. On the afternoon in question, there was heavy traffic. Indeed, the traffic was so heavy that Agent Navar was unable to turn around when he was a mile or two south of the checkpoint. If traffic was significant and slow-moving, an innocent driver could be inclined to reverse directions in order to take an alternate route. Whether the U-turn was performed at the last possible opportunity is also a relevant consideration in determining whether the driver sought to avoid law enforcement. The Government did not inquire into the opportunities for drivers to reverse direction before or after the point at which Defendant turned around.

In sum, driving behavior cannot be evasive if a driver was not aware of the presence of law enforcement. The Government put forth no evidence to demonstrate what, if any, awareness approaching drivers would have of the Highway 180 checkpoint from one mile away. Consequently, the Court cannot find that Defendant executed the U-turn in an effort to evade officers. In addition, the fact that Defendant pulled to the side of the road shortly after making the U-turn is inconsistent with an inference that Defendant was driving in an evasive manner.

Additionally, the fact that three vehicles performed U-turns in conjunction could be a strong factor contributing to the reasonable suspicion analysis were the requisite facts developed. However, to support the inference that the three vehicles were traveling together, the Government is required to introduce some evidence in support. Here, there was evidence that the vehicles were not, in fact, traveling in conjunction. First, only one vehicle pulled to the side of the road a mile before reaching the checkpoint. Second, there was heavy traffic on the day in question. As stated above, slow moving traffic might induce innocent drivers to turn around in order to take an alternate route. Certainly, depending on the extent of the traffic, multiple vehicles might turn around at approximately the same time. Third, there was no testimony as to other opportunities for innocent travelers to turn around as they approached the checkpoint. If there had been no earlier opportunities to turn, multiple drivers might be observed turning at the same place in the road. There is no evidence regarding the order in which the vehicles turned around or the proximity between them as they approached the checkpoint. Given that Defendant pulled over shortly after performing the U-turn, apparently unlike the other vehicles, it is reasonable to infer that the vehicles were traveling separately.

Additional facts that were not adduced in the hearing might have assisted the Court in finding reasonable suspicion arising from U-turns by multiple vehicles in short succession. For example, reasonable suspicion might exist if the agent knew from experience that drug or alien traffickers often travel in groups of more than one vehicle. Had the three vehicles been following one after the other on Highway 180 and then performed the U-turn in conjunction, it would be reasonable to suspect that the vehicles were being driven as a convoy.

However, no such facts are before the Court.

Had the factors supporting a reasonable suspicion been developed in the course of the evidentiary hearing, the Court might find that the United States satisfied its burden. Indeed, the Court can imagine circumstances giving rise to reasonable suspicion to stop the Dodge truck. However, bearing in mind that it is the United States' burden, the Court cannot fill in the blanks. The facts simply were not presented to the Court. In summary, the factors supporting the stop are proximity to the border, the use of Highway 180 for checkpoint evasion, the surprise nature of the checkpoint, and the U-turn. However, the majority of the heavy traffic on road on the day in question was legitimate, and the Government failed to establish that the Defendant's driving behavior was evasive. As a result, the Court concludes that the totality of the circumstances did not generate reasonable suspicion to stop Defendant's vehicle.

## II. The Duration of the Detention

 Even if the stop had been supported by reasonable suspicion, the stop was unduly prolonged. "Investigative detention of a vehicle and its occupants must be reasonably related in scope to the circumstances that justified the stop." *Cheromiah*, 455 F.3d at 1222 (citing *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir.2001)). When an agent conducts an investigative stop, he "may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances," *United States v. Brignoni–Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), but the detention must "last no longer than is necessary to effectuate the purpose of the stop." *United States v. Millan–Diaz*, 975 F.2d 720,

721 (10th Cir.1992) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). In assessing whether a detention is too lengthy to be justified as an investigative stop, courts are directed to focus less on the length of the detention and instead "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly. . . ." *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

■■■ The driver may be detained beyond the length of time necessary to achieve the purposes of the stop only "if, during the course of a roving patrol stop, the Border Patrol agent develops an objectively reasonable and articulable suspicion that the occupants are engaged in some other illegal activity, or if the encounter becomes consensual." *Cheromiah*, 455 F.3d at 1222 (citing *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004)). However, if no further suspicion develops, a detention may cease to be investigatory "and become an arrest if it continues for an excessive time or closely resembles a traditional arrest." *Morris v. Noe*, 672 F.3d 1185, 1192 (10th Cir.2012) (citing *Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 186, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004)). "An arrest is 'characterized by highly intrusive or lengthy search or detention,' and must therefore be supported by probable cause." *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir.2004) (quoting *Oliver v. Woods*, 209 F.3d 1179, 1185 (10th Cir.2000)).

Agent Navar did not articulate his purpose in conducting the stop, which poses a challenge for the Court. The sole articulated purpose was that Defendant had, by executing a U-turn, evaded a checkpoint. As a roving patrol stop, then, Agent Navar was permitted to determine the Defendant's citizenship and immigration status and to ask Defendant to explain why he performed a U-turn and whether he was traveling with the two other vehicles. *See Brignoni–Ponce*, 422 U.S. at 881–82, 95 S.Ct. 2574.

The Government argues that the forty minute detention in the instant case is justified because Agent Navar was waiting for the personal record check. The Court recognizes that Border Patrol agents, like local law enforcement, have an interest in determining a person's identity and running a computer check for warrants. A detainee's identity "serves important government interests, such as informing the officer that a suspect is wanted for another offense, or has a record of violence or mental disorder." *United States v. Burleson*, 657 F.3d 1040, 1046 (10th Cir.2011) (quoting *United States v. Villagrana–Flores*, 467 F.3d 1269, 1275 (10th Cir. 2006)) (internal quotation marks omitted). An additional justification for obtaining a criminal history check is officer safety, "because by determining whether a detained motorist has a criminal record or outstanding warrants, an officer will be better apprized of whether the detained motorist might engage in violent activity during the stop." *Id.* (quotation and alterations omitted). Such identity checks ordinarily take just a few minutes, and the effect on the duration of a *Terry* stop is only de minimis. *See Arizona v. Johnson*, 555 U.S. 323, 334, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009); *United States v. Alcaraz–Arellano*, 441 F.3d 1252, 1258–59 (10th Cir.2006). The Tenth Circuit has specifically stated that running such checks is permissible so long as the detention is for a "short period." *Id.* (citation omitted). However, a driver who is not carrying a license may not be held "indefinitely" pending the results of a record check. *United States v. Shareef*, 100 F.3d 1491, 1501–02 (10th Cir.1996). Despite the importance of such checks, prolonging a detention in excess of thirty minutes is not

*de minimis,* and the Court must consider whether such a lengthy detention was permissible.

■■■ One consideration for the Court is whether the purpose of the stop had been achieved before the check returned. Once the purpose of a stop is achieved, a driver should ordinarily be free to leave. In cases involving traffic stops, once the officer's suspicion that a traffic violation occurred is dispelled, prolonging the detention by retaining the defendant's identification, questioning the defendant further, or waiting for the outcome of a computer check, even if the check is in progress, is improper and in violation of the Fourth Amendment. *United States v. Pina–Aboite,* 109 Fed.Appx. 227, 234 (10th Cir.2004); *United States v. Valadez,* 267 F.3d 395 (5th Cir.2001); *United States v. McSwain,* 29 F.3d 558, 561–62 (10th Cir.1994).

Here, the Defendant answered Agent Navar's questions. He explained his reason for turning around prior to the checkpoint—because he was working on the vehicle's transmission. That fact also explained the reason that the truck was not registered to him, which Defendant acknowledged, and Defendant's authority to operate the truck. Agent Navar did not testify that he was suspicious of Defendant's explanation. Defendant provided his name and date of birth. Agent Navar did not testify that he made any citizenship inquiries of Defendant. Agent Navar did not testify that he made any inquiries regarding Defendant's criminal history.[3] Defendant did not provide a form of identification, stating that he did not have his driver's license on him. Any potential suspicion that Defendant was transporting illegal immigrants would have been dispelled once Agent Navar determined that Defendant was the only person in the vehicle, and the fact that Agent Navar did not testify that he made any inquiries into Defendant's citizenship indicates that he did not suspect Defendant of being an illegal immigrant. Once Agent Navar questioned Defendant regarding his citizenship and asked about the suspicious circumstances, Agent Navar's suspicions were apparently dispelled and the purpose of the stop was achieved. As soon as Agent Navar addressed the purpose of the stop, even though the personal record check had not come back, Agent Navar should have terminated the encounter and allowed Defendant to go on his way. *Millan–Diaz,* 975 F.2d at 722; *see also United States v. De La Cruz,* 703 F.3d 1193 (10th Cir.2013).

A second consideration is whether Agent Navar diligently pursued his investigation. Here, the purpose of the stop was achieved shortly after the vehicle was stopped. However, Agent Navar persisted in detaining Defendant until the return of the record check due to protocol. Agent Navar testified that, in order to accomplish the check, he asked Defendant his name and date of birth and used his personal cell phone to call in the information. He did not state the response from dispatch and he did not indicate that he took any further steps in pursuit of the record check. The Tenth Circuit has held that an officer suspicious that a vehicle was stolen failed to diligently investigate his suspicion when he requested computer checks on the defendant and the car promptly after it was stopped, again immediately after conversing with defendant, and again within five minutes of the initial stop but took no

---

**3.** Ultimately, Agent Navar did state that Defendant mentioned having a nonextraditable warrant. The significance of this statement is discussed below, and at this point it suffices to say that Agent Navar did not indicate any concern regarding Defendant's criminal history during the initial conversation following the stop, as it was described in the hearing.

further steps after being informed that the defendant had a valid license and no outstanding warrants. *United States v. Acosta–Chavez,* 153 F.3d 728, 1998 WL 421822, at *5 (10th Cir. July 27, 1998) (unpublished). The Government failed to elicit any evidence regarding Agent Navar's actions throughout the more than thirty minutes, if any, to expedite the return of the record check. Similarly, the Government did not present evidence as to the reason the check was delayed, which was not within Agent Navar's control but may have been within the control of a Border Patrol agent or employee.

Agent Navar's suspicion, if valid, was dispelled shortly after he stopped Defendant. The duration of the stop while awaiting the return of the record check was far from a *de minimis* additional intrusion. No evidence was adduced demonstrating that there was a justification for the lengthy response time from dispatch or that Agent Navar acted diligently in seeking a return on the record check. Prolonging a stop for thirty minutes after the suspicion justifying the stop is dispelled while awaiting a response from a record check, without providing an explanation for the delay or demonstrating diligence and without additional justification supporting the necessity of a check, is unreasonable.

Though the Tenth Circuit has affirmed traffic stops lasting upward of thirty minutes for a record check, the cases are distinguishable. *See, e.g., United States v. Douglas,* 195 Fed.Appx. 780, 784–85 (10th Cir.2006) (unpublished) (affirming detention of thirty-eight minutes between initiation of traffic stop and validation of license due to dispatch error); *United States v. Villa–Chaparro,* 115 F.3d 797, 802–03 (10th Cir.1997) (finding stop totaling forty-three minutes, five minutes based on traffic violation and thirty-eight additional minutes after officer developed reasonable suspicion of drug offense and wait-

ed for canine unit, reasonable); *United States v. Shareef,* 100 F.3d 1491, 1501–02 (10th Cir.1996) (affirming traffic stop lasting thirty minutes to verify defendant's authority to drive). In these cases, the stop was supported by probable cause due to a traffic offense. The officer who conducted the seizure was a police officer authorized to issue citations for traffic offenses, including driving without a license. Moreover, in *Douglas* and *Shareef,* in which slow computer checks and dispatch error contributed to the delay, there was evidence in the record as to the reason for the delay. 195 Fed.Appx. at 784, 100 F.3d at 1501. The Court has found no similar case in a roving patrol or *Terry* situation where the purpose of the stop has been achieved.

Next, the Court must determine whether Agent Navar developed additional suspicion justifying the prolonged detention or whether the encounter became consensual before the purpose of the stop was accomplished. It is easy to dispel any notion that the encounter was consensual: Agent Navar retained Defendant's keys throughout the course of the stop and testified that the Defendant was not free to leave. The Court concludes that the encounter did not become consensual.

As to whether additional suspicion developed, the Court does not credit Agent Navar's testimony regarding purported incriminatory or inconsistent statements made by Defendant. As such, the only additional suspicious factors occurring after the stop were that Defendant could not present Agent Navar with any identification, the vehicle was not registered to Defendant, Agent Navar perceived the Defendant as nervous, and Defendant stated that he had a nonextraditable warrant. The totality of these facts does not give rise to reasonable suspicion of criminal activity.

The Tenth Circuit has recognized that nervousness is a common reaction to encounters with police and has held that it is of limited significance to the reasonable suspicion analysis "unless it is unusually severe or persistent, or accompanied by other, more probative, grounds for reasonable suspicion. . . ." *United States v. Santos*, 403 F.3d 1120, 1127 (10th Cir.2005) (citations omitted). Moreover, unless the officer has significant knowledge of a person, it is difficult for him to evaluate whether a behavior is normal or evidence of nervousness for that individual. *United States v. Simpson*, 609 F.3d 1140, 1147–48 (10th Cir.2010) (citation omitted). Agent Navar had never previously encountered Defendant, and the Agent did not testify that Defendant's nervousness exceeded that of a normal driver encountering a Border Patrol agent. The Court does not find Defendant's slight nervousness entitled to any weight in the reasonable suspicion analysis.

Regarding the registration, Defendant provided an explanation as to why he was driving a car that did not belong to him. This fact does not add much to the reasonable suspicion analysis, as the Defendant was able to explain why he was driving the vehicle, and there is no evidence of record that Agent Navar found this explanation suspect.

Next, Defendant informed Agent Navar that he had a nonextraditable warrant. That information could generate a reasonable suspicion to hold Defendant pending a return of the warrant check. However, the timing of the statement is extremely important, and the Government elicited no testimony in that regard. Had the statement been made at the beginning of the detention, it might support an inference that Agent Navar was concerned about possible outstanding warrants and was justified in awaiting the results of the record check. On the other hand, had the state-ment been made at the end of the detention, it would not support such an inference. The Court is, again, left to wonder. Consequently, this statement cannot be considered as a factor in the reasonable suspicion analysis.

The sole remaining fact is Defendant's failure to produce identification. The Court must determine whether failure to produce identification to a Border Patrol agent subsequent to a roving patrol or *Terry* stop is alone sufficient to generate reasonable suspicion that some other criminal activity is ongoing. *See United States v. Ledesma–Dominguez*, 53 F.3d 1159, 1161 (10th Cir.1995) (holding reasonable suspicion existed when, after initial checkpoint stop, defendant was unable to produce identification, stated car was not his, and demonstrated nervous behavior and agent noticed masking odor in the vehicle). In the context of a traffic stop, it is clearly established that an officer "may request vehicle registration and a driver's license, run a computer check, ask about travel plans and vehicle ownership, and issue a citation." *United States v. Zubia–Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001) (citations omitted). However, this was not a traffic stop, and the Court takes judicial notice of the fact that the United States Border Patrol does not have juris-diction to enforce New Mexico traffic laws. *See United States v. Hernandez–Lopez*, 761 F.Supp.2d 1172, 1185 (D.N.M.2010). The Court again notes that Agent Navar did not state that the failure to produce identification made him suspicious that the Defendant was involved in any criminal activity. Because Agent Navar had no au-thority to cite Defendant for driving with-out a license and did not question Defen-dant's citizenship, the fact that Defendant did not produce a license alone does not support reasonable suspicion that some other criminal activity was a foot.

The Court concludes that Agent Navar, after questioning the Defendant about the circumstances surrounding the stop and his citizenship, dispelled his suspicions, and the Defendant should have been free to leave. No further reasonable suspicion developed in the course of the stop. The stop at no point became consensual. The Government has failed to demonstrate by a preponderance of the evidence that Agent Navar had reasonable suspicion to stop the vehicle and then to prolong the stop. Additionally, the duration and scope of the stop were unreasonable. As such, the Defendant's Fourth Amendment right to be free from unreasonable seizure was violated.

The search of Defendant's person and vehicle and Defendant's incriminatory statements directly followed the unconstitutional stop. The United States does not argue that an exception to the exclusionary rule applies. Therefore, the Court grants Defendant's request to suppress all evidence resulting from the September 1, 2012 stop. *See Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). **THEREFORE,**

**IT IS ORDERED** that Defendant John Richard Castro's Motion to Suppress Physical Evidence and Statements (Doc. 36) is **GRANTED.**